This Opinion is a
Precedent of the TTAB

Hearing: May 22, 2025                                  Mailed: September 22, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE
____

Trademark Trial and Appeal Board
____

*El Roblar Investment Property LLC*

*v.*

*Bianca Roe*
____

Opposition No. 91272200
____

Wesley M. Mullen, Martin J.E. Arms, and Vincent R. FitzPatrick III of Mullen P.C.
for El Roblar Investment Property LLC.

Curtis W. Herron of Law Office of Curtis W. Herron and Danielle N. Byford of The
Byford Law Firm for Bianca Roe.
____

Before Larkin, Dunn, and Stanley,
  Administrative Trademark Judges.

Opinion by Larkin, Administrative Trademark Judge:

This case is about a hotel in California. It is not the infamous Hotel California, where "you can check out any time you like, but you can never leave,"[1] but like that fantasized lodging, the Hotel El Roblar in this case existed only in the parties' imaginations at all relevant times.

---

[1] THE EAGLES, *Hotel California*, on HOTEL CALIFORNIA (Asylum Records 1976).

Bianca Roe ("Applicant") seeks registration on the Principal Register of the standard-character mark THE HOTEL EL ROBLAR (HOTEL disclaimed) for "hotel services" in International Class 43 based on her claim, under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), that she had a bona fide intention to use that mark in commerce for hotel services when she filed her application Serial No. 88956269 on June 9, 2020.

El Roblar Investment Property LLC ("Opposer") opposes registration of Applicant's mark on two grounds: (1) Applicant lacked a bona fide intention to use THE HOTEL EL ROBLAR in commerce for hotel services when she filed the opposed application; and (2) Applicant's mark falsely suggests a connection with Opposer, in violation of Section 2(a) of the Trademark Act, 15 U.S.C. § 1052(a).[2]

The case is fully briefed,[3] and counsel for the parties appeared at an oral hearing before the panel on May 22, 2025.[4] We sustain the opposition on Opposer's first ground and do not reach Opposer's second ground.

---

[2] As explained below in note 5, Opposer also pleaded, but did not pursue at trial, a claim of likelihood of confusion under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d).

[3] Citations in this opinion to the briefs and other case materials refer to TTABVUE, the Board's online docketing system. The number preceding TTABVUE corresponds to the docket entry number, and any numbers following TTABVUE refer to the page(s) of the docket entry where the cited materials appear. Opposer's main brief appears at 67 TTABVUE and its reply brief appears at 71 TTABVUE. Applicant's brief appears at 70 TTABVUE.

[4] Applicant's brief was filed by her counsel Curtis W. Herron. Mr. Herron's co-counsel Danielle N. Byford appeared at the oral hearing.

## I.    Record and Evidentiary Matters

The record includes the pleadings,[5] the file history of the opposed application, by operation of Trademark Rule 2.122(b)(1), 37 C.F.R. § 2.122(b)(1), and the following materials submitted by the parties during their respective trial and rebuttal periods:

### A.    Opposer

- Opposer's First Notice of Reliance on the two-day discovery deposition of Applicant and certain exhibits thereto ("Roe Tr."), 26 TTABVUE 1-180 (Confidential); 27 TTABVUE 1-185 (Confidential);[6] 28 TTABVUE 1-62 (Non-Confidential Exhibits 1-14);

---

[5] In addition to the two claims noted above, Opposer asserted a claim of likelihood of confusion in its Notice of Opposition, 1 TTABVUE 5-6, but did not pursue that claim at trial or in its main brief, and thus waived it. *Plumrose Holding Ltd. v. USA Ham LLC*, Opp. No. 91272970, 2025 WL 248763, at *1 n.9 (TTAB 2025).

In her Answer, 4 TTABVUE, Applicant denied the salient allegations in the Notice of Opposition and interposed four self-styled affirmative defenses: (1) unclean hands; (2) laches, acquiescence, waiver, and/or estoppel; (3) Opposer's failure to allege "any harm as a result of Applicant's actions alleged in the Notice of Opposition;" and (4) a purported reservation of rights to "rely on other defenses that may become available or appear proper during discovery" through amendment. *Id.* at 4 (Answ. Aff. Defenses ¶¶ 23-26). At the parties' discovery conference, the assigned Board Interlocutory Attorney noted that the third purported affirmative defense was "merely an amplification of the denials in Applicant's answer that did not warrant its striking," 11 TTABVUE 4, but struck the other three affirmative defenses as insufficiently pleaded, allowing Applicant to file an amended answer to replead those defenses. *Id.* at 5. Applicant did not do so and those defenses are thus not at issue.

[6] The entire transcripts of Applicant's discovery deposition were designated as confidential under the Board's Standard Protective Order, and were filed under seal by Opposer at 26-27 TTABVUE. Opposer cited and quoted from Applicant's testimony in multiple places in Opposer's main brief, which was filed in the publicly accessible portion of the docket. 67 TTABVUE 14-16, 23, 25-26, 31, 37-38, 46. In Applicant's brief, which was also filed in the publicly accessible portion of the docket, Applicant did not object to Opposer's citations and quotations from her testimony, and in fact cited portions herself. 70 TTABVUE 16. Opposer also filed all of the exhibits to Applicant's discovery deposition in the publicly accessible portion of the docket, 28-29 TTABVUE, again without objection from Applicant. We find that Applicant waived any objection to public disclosure of her discovery deposition testimony, and we will quote or describe her testimony and exhibits in this opinion notwithstanding the confidentiality designation.

- Opposer's Second Notice of Reliance on non-confidential Exhibits 15-51 from Applicant's discovery deposition, 29 TTABVUE 1-335;

- Opposer's Third Notice of Reliance on the pleadings,[7] Opposer's discovery requests and Applicant's or third parties' responses thereto, portions of the file history of the opposed application,[8] pages from various printed publications, pages from city government records, including the Ojai, California Municipal Code, and pages from a resolution of the City Council of Ojai, 30 TTABVUE 1-190;

- The Trial Declaration of Jeremy McBride, a member of Opposer, and Exhibits 1-4 thereto ("McBride Decl."), 31 TTABVUE 1-24;

- The Trial Declaration of Brian Ford Aikens, a resident of Ojai, and Exhibits A-D2 thereto, 32 TTABVUE 1-311;

- The Trial Declaration of Cathy Cluff, a resident of Ojai, whose family sold certain real property in Ojai to Opposer, and rejected a bid by Applicant to buy that property, and Exhibit A thereto ("Cluff Decl."), 33 TTABVUE 1-11;

- The Trial Declaration of Ramin Shamshiri, a member of Opposer, and Exhibit 1 thereto ("Shamshiri Decl."), 34 TTABVUE 1-144;

- The Trial Declaration of Eric Goode, a member of Opposer ("Goode Decl."), 35 TTABVUE 1-3;

- The Trial Declaration of Evanne St. Charles, an architectural historian and preservation planner, and Exhibits A-D thereto, 37 TTABVUE 1-122;[9]

---

[7] "The pleadings are automatically of record," *Monster Energy Co. v. Lo*, Opp. No. 91225050, 2023 WL 417620, at *2 (TTAB 2023), and it was unnecessary for Opposer to file them.

[8] As noted above, and as Opposer acknowledges in its main brief, "[p]ursuant to 37 C.F.R. § 2.122(b) and [Trademark Trial and Appeal Board Manual of Procedure] § 704.03(a), the file and procedural history of Application Ser. No. 88956269 automatically form part of the record of this Proceeding," 67 TTABVUE 16 n.9, and it was unnecessary for Opposer to submit portions of the application file.

[9] Applicant objects to the St. Charles Declaration on the ground that it is inadmissible expert testimony. 70 TTABVUE 29-30. We need not rule on that objection because we need not rely on her testimony to decide this case. *Flame & Wax, Inc. v. Laguna Candles, LLC*, Canc. No. 92072343, 2022 WL 3083070, at *7 (TTAB 2022).

- The Declaration of Steven Edelson, a hotel operator in Ojai, and Exhibit 1 thereto ("Edelson Decl."), filed during Opposer's rebuttal period, 63 TTABVUE 1-16;[10] and

- The transcript of the cross-examination deposition of Applicant on January 5, 2024, following her submission of the testimony declaration discussed below, and Exhibits 1-17 thereto ("Roe Cross Tr."), filed during Opposer's rebuttal period, 64 TTABVUE 1-278.[11]

## B. Applicant

- Trial Testimony Declaration of Applicant and Exhibits A-1-A-30 thereto ("Roe Decl."), 43 TTABVUE 1-313;[12]

- Trial Testimony Declaration of Applicant's husband Channon Roe ("C. Roe Decl."), 44 TTABVUE 1-5;

---

[10] Mr. Edelson's Declaration was executed on September 12, 2023, 63 TTABVUE 3, before Opposer's rebuttal period was originally set to commence on October 5, 2023, 40 TTABVUE 1; 41 TTABVUE 1, and long before Opposer's rebuttal period as reset actually commenced on May 31, 2024. 61 TTABVUE 12. "'No testimony shall be taken or evidence presented except during the times assigned, unless by stipulation of the parties approved by the Board, or upon motion granted by the Board, or by order of the Board.'" *Spotify AB v. U.S. Software Inc.*, Opp. No. 91243297, 2022 WL 110251, at *3 (TTAB 2022) (sustaining objection to "stale" declaration executed prior to trial period) (quoting Trademark Rule 2.121(a), 37 C.F.R. § 2.121(a), and citing *Robinson v. Hot Grabba Leaf, LLC*, Canc. No. 92060394, 2019 WL 1915759, at *5 (TTAB 2019), *cancellation order vacated on default judgment*, No. 0:19-cv-61614-DPG (S.D. Fla. Dec. 17, 2019)). Applicant did not move to strike the Edelson Declaration on this ground, however, so she waived or forfeited any objection based on its staleness, *see State Permits, Inc. v. Fieldvine, Inc.*, Canc. No. 92075095, 2024 WL 3825297, at *6 (TTAB 2024) (the Board has discretion to consider testimony taken outside a testimony period), and we have considered it.

[11] Opposer purported to submit the "Supplemental Trial Declaration of Evanne St. Charles" executed on November 21, 2024 as an attachment to Opposer's reply brief. 71 TTABVUE 34-42. We have given it no consideration because it is both untimely executed and untimely filed. *Spotify*, 2022 WL 110251, at *3.

[12] Applicant's Declaration appears at the end of 43 TTABVUE, following all 30 exhibits thereto. Our citations to her trial testimony and the exhibits will first list the higher-numbered TTABVUE pages on which her testimony appears followed by the lower-numbered TTABVUE pages on which any referenced exhibits appear. Exhibit A-9 was designated as confidential and was filed under seal at 42 TTABVUE 1-5. Prior to trial, the Board struck certain portions of Exhibits A-13 and A-20 to Applicant's Declaration, 61 TTABVUE 8, and all of Exhibits A-2-A-3, A-6, and A-15-A-19 to Applicant's Declaration, and her related testimony, and excluded those materials from the record. 61 TTABVUE 11-12.

- Applicant's First Notice of Reliance on the transcript of the discovery deposition of Mr. Goode and on non-confidential Exhibits 64-67 thereto ("Goode Tr."), 45 TTABVUE 1-81; 46 TTABVUE 1-130;[13]

- Applicant's Second Notice of Reliance on the discovery deposition of Mr. Shamshiri and on non-confidential Exhibits 52-59 thereto ("Shamshiri Tr."), 47 TTABVUE 1-136 48 TTABVUE 1-101;[14] and

- Applicant's Third and Amended Fourth Notices of Reliance on Opposer's responses to certain of Applicant's discovery requests, 49 TTABVUE 1-24; 62 TTABVUE 1-29.[15]

Applicant did not cross-examine any of Opposer's trial witnesses.

---

[13] The parties marked the entire transcript of the Goode discovery deposition as confidential under the Board's Standard Protective Order, and Applicant filed it under seal at 45 TTABVUE. "Confidentiality designations do not provide absolute immunity from the public disclosure of materials so designated." *Kohler Co. v. Honda Gikken Kogyo K.K.*, Opp. No. 91200146, 2017 WL 6547628, at *5 (TTAB 2017) (citing *Noble House Home Furnishings, LLC v. Floorco Enters., LLC*, Canc. No. 92057394, 2016 WL 3357265, at *4 n.21 (TTAB 2016) ("The Board needs to be able to discuss the evidence of record, unless there is an overriding need for confidentiality, so that the parties and a reviewing court will know the basis of the Board's decisions.")). *See also* Trademark Rule 2.116(g), 37 C.F.R. § 2.116(g) ("The Board may treat as not confidential that material which cannot reasonably be considered confidential, notwithstanding a designation as such by a party."). We do not consider anything in Mr. Goode's discovery deposition testimony to be confidential, and we will cite and quote from it in this opinion notwithstanding the confidentiality designation.

[14] The parties marked the entire transcript of the Shamshiri discovery deposition as confidential under the Board's Standard Protective Order, and Applicant filed it under seal at 48 TTABVUE. Applicant filed the exhibits used to examine Mr. Shamshiri in the publicly accessible docket at 47 TTABVUE. As with the Goode discovery deposition, we do not consider anything in Mr. Shamshiri's discovery deposition testimony to be confidential, and we will cite and quote from it in this opinion notwithstanding the confidentiality designation.

[15] The Board granted a motion by Opposer to strike Exhibit F-1 to Applicant's original Fourth Notice of Reliance on the ground that it involved superseded discovery responses, but allowed Applicant to cure that defect. 61 TTABVUE 5. Applicant subsequently served an Amended Fourth Notice of Reliance attaching the operative responses. 62 TTABVUE 1-29.

C. **Evidentiary Matter**

As noted above, the Board previously excluded portions of Applicant's trial testimony and exhibits thereto in response to Opposer's motion to strike. 61 TTABVUE 8, 11-12. In its main brief, Opposer acknowledges that

> [m]ost but not all of the Exhibits to Applicant's trial declaration were stricken on motion, along with Applicant's related testimony. . . . Certain of the stricken exhibits were used for purposes of impeachment only (Fed. R. Evid. 607) at the cross-examination of Ms. Roe and are therefore included in the record as exhibits to the cross-examination transcript. . . . Except where this Trial Brief expressly states otherwise, Opposer does not offer in evidence any of the documents stricken by the Board, and it does not waive its rights under the Order determining inadmissibility.

67 TTABVUE 18 n.11 (record citations omitted).

Apparently unwilling to take "yes" for an answer on its motion to strike, Opposer proceeds in its main brief to discuss two of the excluded exhibits and purports to offer them back into evidence. *Id.* at 31 & n.17 (discussing Exhibit A-6, a Google Maps page showing a hotel at 1725 Maricopa Highway in Ojai, and "offer[ing] it in evidence"), 31-33 & n.20 (discussing Exhibit A-16, a purported commercial lease regarding that property, and offering it "affirmatively as evidence of fraud"). In her brief, Applicant discusses the commercial lease, but not the Google Maps page, 70 TTABVUE 18-19, and Opposer again discusses the commercial lease in its reply brief. 71 TTABVUE 16-17, 19 & n.9. Because both Opposer and Applicant discussed the commercial lease, we will consider the parties to have stipulated to our consideration of it, but only in connection with Applicant's testimony on cross-examination and her husband's

testimony at trial that "[c]urrently she has a formal lease agreement at 1725 Maricopa Highway." C. Roe Decl. ¶ 25 (44 TTABVUE 4).

## II. Factual Background

The two primary issues in this case, Opposer's entitlement to oppose and the bona fides of Applicant's claimed intention to use the mark THE HOTEL EL ROBLAR in commerce for hotel services when she filed the opposed application, are extremely fact-intensive. In this section, we set forth in detail the undisputed facts relevant to our disposition of those issues, and our resolution of any disputed factual issues.

### A. The Parties

Applicant is a resident of Ojai, California, a small city in Ventura County northwest of Los Angeles. Roe Decl. ¶¶ 2, 46 (43 TTABVUE 304, 309). She and her husband operated a boutique retail store in Ojai called In the Field for a number of years at 730 East Ojai Avenue. Roe Decl. ¶ 3 (43 TTABVUE 304); Roe Tr. 46:25-48:10 (26 TTABVUE 51-53). Applicant has been registered as a host on the booking website Airbnb since 2012, Roe Decl. ¶ 6 (43 TTABVUE 305), and she and her husband have operated a property located in the Silver Lake area of Los Angeles as a bed and breakfast through Airbnb for over 10 years. Roe Decl. ¶ 6 (43 TTABVUE 305). Applicant has also been a licensed real estate agent in California since at least 2014,[16] and at the time of trial was working at LIV Sotheby's in Ojai. Roe Decl. ¶ 10 (43 TTABVUE 305).

---

[16] Applicant testified in her discovery deposition that she began working as a real estate agent in 2013, Roe Tr. 133:20-22; 135:5-7 (26 TTABVUE 138, 140), not in 2014, as she testified at trial.

Opposer is a Delaware limited liability company whose principal office and business location at the time of trial was at 122 East Ojai Avenue in Ojai. McBride Decl. ¶ 4 (31 TTABVUE 2). Opposer was formed on or about May 17, 2019 for the purpose of purchasing, developing, and managing a luxury hotel to be located at that address. McBride Decl. ¶ 5 (31 TTABVUE 2). At the time of trial, Opposer had four members, Jeremy McBride, Eric Goode, Warner Ebbink, and Ramin Shamshiri. McBride Decl. ¶¶ 6, 9-11 (31 TTABVUE 3).

## B. Applicant's Claimed Desire to Enter the Hotel Business

Applicant testified at trial that in 2012, she registered as a host on the booking site Airbnb. Roe Decl. ¶ 6 (43 TTABVUE 305). She further testified that she has operated a property located in the Silver Lake area in Los Angeles as a bed and breakfast since 2013, that she has been designated as a "Super Host" on Airbnb since 2014, Roe Decl. ¶¶ 6-8; Ex. A-1 (43 TTABVUE 305, 3-20),[17] and that "[i]t has been my profession to manage[:] all guest communications, concierge, new guest arrival and departure, including all permits and insurance." Roe Decl. ¶ 6 (43 TTABVUE 305). On cross-examination, she stated that she believed that she was providing hotel services when she rented out her property through Airbnb. Roe Cross Tr. 50:7-22; 70:8-14 (64 TTABVUE 53, 73).

Applicant also testified at trial that "[m]y husband and I have wanted to open a Hotel in Ojai for some time, the name The Hotel El Roblar matched numerous

---

[17] Applicant testified at trial that she has also listed other locations on Airbnb, Roe Decl. ¶ 9; Exs. A-2-A-3 (43 TTABVUE 305, 21-24), but her testimony and related exhibits regarding those locations were excluded from the record. 61 TTABVUE 11-12.

locations in Ojai that were available when I registered the mark, and when I secured the brand identities in 2017." Roe Decl. ¶ 11 (43 TTABVUE 305).[18] She did not explain what she meant by "register[ing] the mark" or "secur[ing] the brand identities in 2017." She testified that "[w]hen I acquired the social media handles in 2017 (i) the Twitter accounts @Elroblar and @Elroblarhotel.com; (ii) the Instagram accounts @Thehotelelroblar; @Theroblarhotel, @Hotelrolbar [sic], @Hotelroblarojai, @Elroblarhotelojai, @elroblarhotel, and @Thehotelroblarojai; and (iii) the Facebook accounts, it was with the intent to use as a hotel." Roe Decl. ¶ 28 (43 TTABVUE 307).

There is no documentary corroboration that Applicant acquired these "social media handles in 2017," and she testified in her discovery deposition that "I had secured in 2018 different marketing terms regarding that particular name," Roe Tr. 68:22-23 (26 TTABVUE 73), that "I purchased and maintained multiple web domains and other social media names in 2018," Roe Tr. 69:4-5 (26 TTABVUE 74), and that the social media handles were "collected in 2018." Roe Tr. 93:12-17 (26 TTABVUE 98).

Exhibits A-4 and A-5 to Applicant's trial testimony confirm her purchase of the various domain names on August 16, 2018. Roe Decl. ¶¶ 12-13 Exs. A-4-A-5 (43 TTABVUE 304-05, 25-28). In her discovery deposition, Applicant confirmed her acquisition of the domain names in 2018, Roe Tr. 118:17-20 (26 TTABVUE 123), and in an interrogatory response, Applicant stated that she first formed her intent to use

---

[18] Applicant's husband testified that since Applicant received her real estate license "we have both been very committed to the dream of finding, designing, and operating a hotel." C. Roe Decl. ¶ 6 (44 TTABVUE 3).

the mark THE HOTEL EL ROBLAR for hotel services on August 16, 2018, the day on which she purchased the domain names. Roe Tr. 185:16-186:3 (27 TTABVUE 43-44). Contrary to Applicant's trial testimony, the record shows that she first acquired the domain names on August 16, 2018 and that she first acquired what she called the various "social media handles" at some point around that time in 2018.

Applicant also testified at trial that

> [i]n 2017 my husband and I had engaged with Dustin Lancaster. Mr. Landcaster [sic] was in development on a boutique hotel in Downtown Los Angeles, The Firehouse Hotel. During this time, I had expressed my interest in opening a boutique hotel in Ojai, Mr. Lancaster shared confidential investor decks, and toured us around his 8 room hotel, which was under construction.

Roe Decl. ¶ 18 (43 TTABVUE 306). Applicant testified in her discovery deposition, however, that she has discussed using the mark THE HOTEL EL ROBLAR with her husband only since 2018. Roe Tr. 129:13-21 (26 TTABVUE 134). The record shows that Applicant was not considering use of the mark THE HOTEL EL ROBLAR in 2017 when she "expressed my interest in opening a boutique hotel in Ojai" and toured The Firehouse Hotel with Mr. Lancaster and her husband.[19]

---

[19] Applicant testified at trial about other locations that she claimed that she considered at some point for use as a hotel, including a retirement home in Ojai, and hotels in France, Montauk, New York, and Mexico. Roe Decl. ¶¶ 20-21, 23; Exs. A-11-A-12, A-14 (43 TTABVUE 306-07, 41-123, 127-28). She admitted that the retirement home could not be used as a hotel, Roe Decl. ¶ 21; Ex. A-12 (43 TTABVUE 306, 43-123); Roe Cross Tr. 32:11-35:25; Exs. 7-8 (64 TTABVUE 35-38, 143-222), and that she did not have an intent to use the mark THE HOTEL EL ROBLAR in connection with a property in Mexico. Roe Cross Tr. 20:12-14 (64 TTABVUE 23). She gave equivocal answers regarding her claimed intent to use the mark in connection with the properties in Montauk, New York, and France, Roe Cross Tr. 22:10-24:6 (64 TTABVUE 25-27), but we find that this testimony is not probative of her intent to use the mark THE HOTEL EL ROBLAR in connection with hotel services because, as discussed

### C.   The Hotel Property at 122 East Ojai Avenue in Ojai

Opposer's trial witness Cathy Cluff testified that her parents purchased real property at 122 East Ojai Avenue in Ojai in 1977, Cluff Decl. ¶ 2 (33 TTABVUE 2), and that they founded The Oaks at Ojai, a hospitality and spa business. Cluff Decl. ¶ 1 (33 TTABVUE 2). Ms. Cluff's parents operated a hotel and spa called The Oaks at Ojai at that location for several decades. Cluff Decl. ¶¶ 3, 8 (33 TTABVUE 2-3). Ms. Cluff began working in the family business in 1989, and became its CEO in 2010. Cluff Decl. ¶ 3 (33 TTABVUE 2).

At the time of its construction in the early 20th Century, the hotel located at 122 East Ojai Avenue was originally known as and operated as the "El Roblar." Cluff Decl. ¶ 7 (33 TTABVUE 3). Applicant admitted in her discovery deposition that she knew in 2018 that the name "The Hotel El Roblar" had been used at one point in connection with a hotel at 122 East Ojai Avenue. Roe Tr. 119:23-120:11 (26 TTABVUE 124-25); Roe Tr. 206:5-11 (27 TTABVUE 64). She testified at trial that "[t]he property known as The Oaks at Ojai, located [sic] 212 [sic] Ojai Ave, Ojai has been operating under the name The Oaks since 1940's," Roe Decl. ¶ 36 (43 TTABVUE 308), but provided no documentary support or corroboration for her claim. At Mr. Goode's discovery deposition, he testified that he first came to Ojai in 1966 or 1967, Goode Tr. 17:16-17 (45 TTABVUE 20), and that he recalled seeing a sign reading

---

below, she testified at trial that she and her husband had settled on using the mark in connection with a specific hotel in Ojai. Roe Decl. ¶ 14 (43 TTABVUE 306).

"Hotel El Roblar" at the property at 122 East Ojai Avenue. Goode Tr. 20:1-11 (45 TTABVUE 23).

Ms. Cluff's parents operated the hotel as The Oaks at Ojai between 1977 and late 2017, when it was closed, Cluff Decl. ¶ 7 (33 TTABVUE 3), but they kept a large, framed print of the El Roblar hotel and its original architectural drawings on public display in the lobby of the hotel for decades and one of the main gathering spaces at the hotel was known as the "El Roblar Lounge," a reference to the history of the building and its founder, Edward Libbey. Cluff Decl. ¶ 10 (33 TTABVUE 3-4).

The Oaks at Ojai hotel closed in late 2017 after it was damaged in the Thomas fire, Cluff Decl. ¶ 1 (33 TTABVUE 2), an enormous fire that devastated large areas of the Ojai Valley. McBride Decl. ¶ 15 (31 TTABVUE 4). At some point in 2018, the Cluff family decided to sell the property, which it held through El Roblar Property LP, a limited partnership controlled by the family. Cluff Decl. ¶ 12 (33 TTABVUE 4). From approximately October through December of 2018, the Cluff family's attorney, Ted Muegenburg, received bids to purchase the property through a request for proposal process. Cluff Decl. ¶ 14 (33 TTABVUE 4). Applicant received a copy of the request for proposal. Roe Tr. 228:1-229:8; Ex. 23 (27 TTABVUE 86-87; 29 TTABVUE 204-08); Roe Decl. ¶ 37; Ex. A-21 (43 TTABVUE 308, 213-18).[20] Applicant and the future members of Opposer ultimately submitted bids, but as discussed immediately

---

[20] The request for proposal set a deadline for the submission of proposals of 5:00 p.m. on December 31, 2018. Roe Decl. Ex 21 (43 TTABVUE 214).

below, Applicant was involved in efforts to purchase the property before it formally went on the market.

### D. Applicant's Attempt to Purchase the Property at 122 East Ojai Avenue

Applicant testified in her discovery deposition that in May or June 2018, she first toured the property at 122 East Ojai Avenue with her husband, Mr. Goode, and Ms. Cluff. Roe Tr. 172:2-8 (27 TTABVUE 30).[21] Her testimony reflected her belief at that time that the Cluff family might soon sell the property.

In her discovery deposition, Applicant authenticated and testified about a lengthy exhibit consisting of texts between her and Mr. Goode, a fellow Ojai resident, at various times between 2018 and 2020 that were produced by Applicant in discovery. Roe Tr. 207:21-209:16; Ex. 18 (27 TTABVUE 65-67, 29 TTABVUE 94-197). Mr. Goode was also examined about the texts during his discovery deposition. Goode Tr. 25:2-26:19; 27:23-30:20; Exs. 65-66 (45 TTABVUE 28, 30-33; 46 TTABVUE 17-125).[22] The texts in 2018 and 2019 primarily concerned Applicant's attempt to purchase the

---

[21] In his trial testimony, Applicant's husband mistakenly placed the tour in 2017. C. Roe Decl. ¶ 14 (44 TTABVUE 3) ("In 2017 my wife Bianca and I pursued the idea of purchasing a hotel and were able to see the property at 212 [sic] Ojai Ave, Ojai for the first time and took along Eric Goode who had expressed interest as a potential investor."). As discussed below, the record shows that the tour actually occurred in July 2018.

[22] Mr. Goode testified in his discovery deposition that texting was the normal means of communication with Applicant and that "she texted me a lot." Goode Tr. 36:4-8 (45 TTABVUE 39).

property at 122 East Ojai Avenue, and they provide useful information in that regard.[23]

A June 26, 2018 text from Applicant to Mr. Goode states that Applicant had met with a representative of The Oaks at Ojai and that Applicant believed that the Cluffs were likely to put the property up for sale later in the year. The text concluded that Applicant was thinking about "requesting a tour of the property." Roe Tr. Ex. 18 (29 TTABVUE 105). On July 2, Applicant texted Mr. Goode that she had written Ms. Cluff for a tour, Roe Tr. Ex. 18 (29 TTABVUE 109), and a subsequent text confirmed that a tour had been scheduled. Roe Tr. Ex. 18 (29 TTABVUE 110). It appears that Applicant and Mr. Goode toured the property in July, and by the end of July, Applicant had met several times with Ms. Cluff regarding the property. Roe Tr. Ex. 18 (29 TTABVUE 132-34).

---

[23] In her trial testimony, Applicant accused Mr. Goode of deceit in connection with her attempts to purchase the property at 122 East Ojai Avenue through misrepresentation of his intention to participate in the purchase together with Applicant and her husband. Roe Decl. ¶¶ 56-59 (43 TTABVUE 311). Mr. Goode denied those accusations in his trial testimony. Goode Decl. ¶ 8 (35 TTABVUE 3). The texts between Applicant and Mr. Goode, a number of which are discussed or quoted below, show that Mr. Goode acted as a sounding board or adviser to Applicant, that by late October 2018, Applicant knew that Mr. Goode might not be involved with her in purchasing the property, and that by late November 2018, it was "very clear to both Channon & I that you don't want to partner with us at this point, we would however, like to ask advice from you moving forward, so we can continue to work towards making our dream a reality." Roe Tr. Ex. 18 (29 TTABVUE 163-64, 174). Ms. Cluff testified that she was suspicious about whether Mr. Goode was Applicant's partner because Ms. Cluff was dealing with him as part of the group that ultimately became Opposer, and she could never get a satisfactory explanation from Applicant on that issue. Cluff Decl. ¶¶ 15, 18 (33 TTABVUE 4-5). In the final analysis, we conclude that neither Mr. Goode's possible misconduct in his dealings with Applicant, nor Applicant's possible misrepresentations to the Cluff family regarding his participation, are relevant to Applicant's intention to use the mark THE HOTEL EL ROBLAR when she filed the opposed application in June 2020.

The texts also indicate that Applicant was researching permits, licenses, and parking for the property in July 2018. Roe Tr. Ex. 18 (29 TTABVUE 118-19). In late July, Applicant texted Mr. Goode about using a "strawman" to make an offer or making an offer through an intermediary. Roe Tr. Ex. 18 (29 TTABVUE 126-27). A July 30 text from Applicant to Mr. Goode confirmed a lengthy meeting between Applicant and Ms. Cluff. Roe Tr. Ex. 18 (29 TTABVUE 133).

Applicant testified in her discovery deposition that by early August, she was researching numbers and loans. Roe Tr. 216:11-219:22; Exs. 18-19 (27 TTABVUE 74-77; 29 TTABVUE 137-38, 199-200). On August 20, Applicant texted Mr. Goode that she was preparing a letter of intent and a confidentiality agreement with respect to possible purchase of the property. Roe Tr. Ex. 18 (29 TTABVUE 148-49).

Applicant also texted Mr. Goode that she was looking at Small Business Administration loan financing. Roe Tr. Ex. 18 (29 TTABVUE 152-53). Applicant testified in her discovery deposition that she worked with Annette Jorgensen, a loan broker at American Riviera Bank in Santa Barbara, California, "in relationship to financing the acquisition of The Oaks Hotel," Roe Tr. 196:5-15; Ex. 25 (27 TTABVUE 54, 29 TTABVUE 210-14), and the text chain displays a letter from Ms. Jorgensen to Applicant regarding SBA loans for $10,000,000 or $13,000,000. Roe Tr. Ex. 18 (29 TTABVUE 162).[24]

---

[24] Applicant testified at trial that she and her husband had been working with Ms. Jorgensen with respect to obtaining an SBA loan, Roe Decl. ¶ 22 (43 TTABVUE 307), but Exhibit A-13 accompanying her testimony, an email from Ms. Jorgensen regarding an SBA loan for $10,000,000 or $13,000,000, Roe Decl. Ex. A-13 (43 TTABVUE 125-26), was excluded from the record with respect to "the date of the email and the correspondent's email address." 61 TTABVUE 8.

Applicant testified in her discovery deposition that she submitted a five-page proposal to purchase the property on behalf of herself, her husband, and Mr. Goode. Roe Tr. 238:1-239:2; Ex. 27 (27 TTABVUE 96-97; 29 TTABVUE 220-24). The offered purchase price was $10,750,000. Roe Tr. Ex. 27 (29 TTABVUE 224). Applicant further testified that it was submitted to the Cluff family prior to a "formal presentation." Roe Tr. 240:4-15 (27 TTABVUE 98). She did not recall when she submitted it, Roe Tr. 239:3-4 (27 TTABVUE 97), but she emailed it to herself on October 5, 2018, Roe Tr. 239:5-13 (27 TTABVUE 97), and according to a text to Applicant from Kimberly Cluff, Cathy Cluff's sister, Applicant had submitted an information packet by October 20. Roe Tr. Ex. 18 (29 TTABVUE 151).

On October 25, Applicant sent a text to Mr. Goode asking him to join a call with the Cluffs regarding their response to Applicant's proposal and the issue of financing for a purchase. Roe Tr. Ex. 18 (29 TTABVUE 163). The text also advised Mr. Goode that

> Please know, at anytime – you decide you don't want to partner up, we are more than confident that we can find a different partner, with the numbers and opportunity that this is.
>
> Fact is, we want to do this with you first. . . . Now, we need your help, to open this door to a conversation with The Cluff's [sic] and find out if the work that I've been cultivating for the last 6-9 months has any value, or potential for the future.
>
> Again, we thought you were on board . . . but no hard feelings either way. We just want to make this happen, with you before any other.

Roe Tr. Ex. 18 (29 TTABVUE 163-64).[25]

On November 1, Applicant texted Mr. Goode that the Cluff family was "not ready to sell the property right now," but that they wanted to schedule a call "with all of us, and discuss a Joint Venture." Roe Tr. Ex. 18 (29 TTABVUE 168-69). On November 3, she texted Mr. Goode that there were multiple parties interested in the property and that she needed to know "if u want to proceed with us, we have a very good relationship with the family." Roe Tr. Ex. 18 (29 TTABVUE 171).

On November 26, following a November 18 text from Kimberly Cluff to Applicant regarding a possible meeting, Applicant sent Mr. Goode a text that stated in pertinent part as follows:

> We've been in discussions now together over 8 months on The Oaks, it's very clear to both Channon & I that you don't want to partner with us at this point, we would however, like to ask advice from you moving forward, so we can continue to work towards making our dream a reality. This really is a great opportunity for our family, for town at large, with the very best prime location in Ojai. I am at a loss, as to why you have chosen to ignore us after so many positive plans together . . but whatever, we need to move on. It is both, Channon and my, dream for the future, what we have always wanted to do . . . we want The Oaks, we want to be a part of [its] next chapter, we believe it is a great opportunity for that alone - I would appreciate a dialogue with you on what our next move should be.

Roe Tr. Ex. 18 (29 TTABVUE 175).

Applicant later texted Mr. Goode as follows:

> [W]e would just like you to be an advisor, take a few phone calls. No commitment necessary, if you have no bandwith

---

[25] A sentence in this text that begins with the words "It's why we brought" is obscured and we do not quote or paraphrase it for that reason.

> – we have more than enough to go around – fact is we don't even know what is possible. What we do need, is a phone call with The Cluffs to explore the options, and your advi[c]e. That doesn't hurt anyone.

Roe Tr. Ex. 18 (29 TTABVUE 177).

On December 10, Mr. Goode responded that "I just heard from two people that the Oaks is on the market! Sound[s] like they are selling it. Also sounds like a potential bidding war." Roe Tr. Ex. 18 (29 TTABVUE 178).[26] He later texted Applicant that "I think that it is maybe best for me not to get involved. There are other people we know who are interested." Roe Tr. Ex. 18 (29 TTABVUE 179).

At some point in late 2018, Applicant hired Butler Consultants, a firm that prepares business plans. Roe Tr. 147:1-5, 18-20 (27 TTABVUE 32). Applicant "contacted them about the potential of a business plan relating to the mark," Roe Tr. 175:2-8 (27 TTABVUE 33), and signed an "Agreement for Service" on January 18, 2019 for Butler Consultants to complete a "Level 3 Business Plan" on a "Rush" basis. Roe Tr. 243:11-244:11; Ex. 30 (27 TTABVUE 101-02; 29 TTABVUE 231-32).

Prior to Applicant's execution of the Agreement for Services, Butler Consultants sent a document to Applicant "in relationship to a business plan." Roe Tr. 277:1-10; Ex. 47 (27 TTABVUE 135, 29 TTABVUE 299-330). It was captioned "The El Roblar Hotel." Roe Tr. Ex. 47 (29 TTABVUE 299). The document contained multiple questions followed by what appear to be Applicant's answers, as well as sections where Applicant was requested to provide information. One of the questions, "What

---

[26] Applicant testified in her discovery deposition that she recalled that there were four parties who were interested in acquiring the property. Roe Tr. 139:24-140:9 (26 TTABVUE 144-45).

is the name of your company?," was followed by the answer "The El Roblar Hotel," which the document states is to be located in Ojai. Roe Tr. Ex. 47 (29 TTABVUE 300). The document contained numerous references to the historical significance of the El Roblar Hotel to the Ojai community. Roe Tr. Ex. 47 (29 TTABVUE 301, 304, 306, 308, 315-30). Applicant admitted that she authored portions of the document, but did not recall which ones. Roe Tr. 277:11-13 (27 TTABVUE 135).

On December 26, 2018, Applicant texted Mr. Goode asking for "an example of Proposal for a hotel acquisition that I could work from to submit professionally before Dec. 31. Something that you can email me?" Roe Tr. Ex. 18 (29 TTABVUE 187). On December 31, she texted Mr. Goode that she had "[s]ent you an email, need to get our submission in by 5. I included verbiage, so you can be in or out at anytime. . . . just want to get our foot in the door. Am available to discuss." Roe Tr. Ex. 18 (29 TTABVUE 187). Ms. Cluff confirmed that "[o]n December 31, 2018, Ms. Roe submitted a written letter of intent to purchase the hotel by email to our attorney, Ted Muegenburg." Cluff Decl. ¶ 16; Ex. 4 (33 TTABVUE 5, 8-10).

On January 9, 2019, Applicant texted Mr. Goode that she had "offered them $10,000,000 – because of the SBA loan limit" and that she "[n]eed[ed] help w[ith] financials to qualify, so I'd love to discuss with you." Roe Tr. Ex. 18 (29 TTABVUE 189). On January 10, 2019, Applicant and Mr. Goode exchanged texts stating that all of the offers for the property were around $10,000,000 and that Applicant really wanted Mr. Goode to partner with her. Roe Tr. Ex. 18 (29 TTABVUE 190).

Applicant authenticated a January 18, 2019 email exchange with her loan broker Ms. Jorgensen in which Applicant requested, but Ms. Jorgensen declined to provide, a "Revised Letter of Intent for Purchase of Real Property" with respect to the property. Roe Tr. 235:8-19; Ex. 25 (27 TTABVUE 93; 29 TTABVUE 210-14). Ms. Jorgensen wrote that "[w]e do not have enough information to really even do an interest letter." Roe Tr. Ex. 25 (29 TTABVUE 210).

### E. Opposer's Offer to Purchase the Property at 122 East Ojai Avenue

Like Applicant, Mr. McBride and the other future members of Opposer learned in 2018 that the property at 122 East Ojai Avenue was available for purchase, McBride Decl. ¶ 14 (31 TTABVUE 4), and became aware of the Cluff family's request for proposals. McBride Decl. ¶ 16 (31 TTABVUE 4). Mr. McBride testified that in December 2018, the future members of Opposer "submitted a comprehensive bid to purchase the property for approximately $13.5 million dollars." McBride Decl. ¶ 17 (31 TTABVUE 4).

### F. The Rejection of Applicant's Bid and Her Activities in the Immediate Aftermath

Ms. Cluff testified that "[i]n January 2019, Mr. Muegenberg [sic] informed Ms. Roe that our family had selected a buyer and that her offer would not be accepted. Ms. Roe asked to be considered as a backup offer, but our attorney informed her that

there were already two financially-sound backup offers on the table." Cluff Decl. ¶ 17 (33 TTABVUE 5).[27]

Applicant sent a January 21, 2019 email to Brian Butler at Butler Consultants in which she stated that "[w]e just found out we lost the bid for the hotel purchase." Roe Tr. 241:16-242:16; Ex. 29 (27 TTABVUE 99-100, 29 TTABVUE 100-01). In her email to Mr. Butler, Applicant instructed him to "please stop work" and told him that "I'd like to use the money paid towards a different Buisness [sic] plan, one for our retail store and bar/event space for SBA loan financing." Roe Tr. 242:21-243:4; Ex. 29 (27 TTABVUE 100-01; 29 TTABVUE 229). Applicant asked Mr. Butler whether she could "take a beat before re-submitting on this" and whether Mr. Butler would honor Applicant's deposit if she "resumed in a month[.]" Roe Tr. Ex. 29 (29 TTABVUE 229). Mr. Butler agreed to Applicant's request, Roe Tr. Ex. 29 (29 TTABVUE 229), but Applicant testified that Butler Consultants never prepared a business plan for Applicant's retail store and bar/event space, Roe Tr. 243:5-7 (27 TTABVUE 101), and there is no evidence of Applicant's own preparation of a business plan for any hotel.

On January 22, 2019, the day after her email to Butler Consultants, Applicant sent an email to her loan broker Ms. Jorgensen in which Applicant stated as follows:

> Unfortunately, we missed out on the bid for the hotel, they were needing a letter of interest last Friday, as they decided on Sunday and I didn't qualify for the submission without it. I was a little under the gun with limited time, so I thank you for your effort towards explaining everything to me thoroughly. I have a Retail Business in

---

[27] Applicant claimed in her discovery deposition that she did not recall how she learned that she had lost the bid. Roe Tr. 242:17-19 (27 TTABVUE 100).

> Ojai that we will now focus all off [sic] our efforts towards, would you let me know what areas SBA finances?

Roe Tr. 245:4-247:20; Ex. 31 (27 TTABVUE 103-05; 29 TTABVUE 234).

Ms. Jorgensen responded as follows:

> SBA can finance all the areas you mention below. The question will be if you are relying on projections or existing debt service based on tax returns to decide on SBA or a non-SBA loan. The SBA has the longer loan term. So let's see what you need in the way of a dollar amount and then we can decide what is best for your business. American Riviera Bank does SBA loans, Cal Coastal loans and regular commercial business loans and real estate loans.

Roe Tr. Ex. 31 (29 TTABVUE 234). Applicant admitted in her discovery deposition that she did not subsequently obtain financing for the purchase of any property for use as a hotel. Roe Tr. 196:19-24 (27 TTABVUE 54).

### G.   Opposer's Purchase of the Property and Subsequent Activities

Mr. McBride testified at trial that the "sellers selected [Opposer's future members] as the winning bidder," and that El Roblar Investment Property LLC "was formed on or about May 17, 2019 for the purpose of purchasing, developing and managing a luxury hotel on the site of the Historic Hotel El Roblar at 122 East Ojai Avenue." McBride Decl. ¶¶ 5, 17 (31 TTABVUE 2, 4). Opposer's "purchase and sale transaction closed in September 2019, at which point [Opposer] became the owner of the historic property." McBride Decl. ¶ 17 (31 TTABVUE 4).[28] Mr. McBride further testified that

---

[28] Applicant obtained a title report on the property at 122 East Ojai Avenue in December 2019 showing that title to the property had been transferred in September 2019 from the Cluff family's company to Opposer. Roe Tr. 250:12-251:10; Ex. 34 (27 TTABVUE 108-09; 29 TTABVUE 247-61). She did not recall why she ordered the report. Roe Tr. 251:14-16 (27 TTABVUE 109).

Opposer registered the domain name elroblarhotel.co in September 2019, McBride Decl. ¶ 19; Ex. 1 (31 TTABVUE 4, 8-11),[29] and "launched a website to publicize[ ] our brand design, our hospitality vision, and our expected re-opening of the Hotel El Roblar." McBride Decl. ¶ 19; Ex. 2 (31 TTABVUE 4, 12-17).[30]

Mr. Shamshiri, the owner of Studio Shamshiri, an architecture and interior design studio based in Los Angeles, and an Ojai resident for more than a decade, Shamshiri Decl. ¶¶ 5-6 (34 TTABVUE 2-3), testified at trial that he had worked on branding and design in connection with the anticipated reopening of the Hotel El Roblar. He authenticated what he called a "schematic book that Studio Shamshiri developed in 2019 setting forth our detailed and historically-influenced designs for the hotel." Shamshiri Decl. ¶ 7; Ex. 1 (34 TTABVUE 3, 4-144). The "schematic book" was captioned "El Roblar." Shamshiri Decl. Ex. 1 (34 TTABVUE 5).

Mr. Shamshiri also testified in his discovery deposition that the property at 122 East Ojai Avenue had been closed since the Thomas fire and was closed when Opposer acquired it, Shamshiri Tr. 26:14-27:4 (48 TTABVUE 29-30), but that Opposer had recently obtained permits and that the property was under construction, with a

---

[29] In his discovery deposition, Mr. Shamshiri testified that "[w]e had secured other domain names," Shamshiri Tr. 53:12 (48 TTABVUE 56), and he authenticated a May 8, 2020 email to him from Mr. McBride in which Mr. McBride stated that in addition to the elroblarhotel.co domain name, Opposer had acquired other domain names. Shamshiri Tr. 50:1-53:22; Ex. 57 (48 TTABVUE 53-56; 47 TTABVUE 44-48).

[30] The screenshots from Opposer's website at elroblarhotel.co in Exhibit 2 to Mr. McBride's trial testimony were captured on April 6, 2023, McBride Decl. Ex. 2 (31 TTABVUE 12-17), and his testimony is vague as to when Opposer "launched a website." The first page of the captured webpages bears the words "the hotel el roblar" in script and the words "Hotel El Roblar" appear in typed font on the top of each page. The penultimate page states that "We are opening our doors soon" and urges visitors to "Please contact us for more information." McBride Decl. Ex. 2 (31 TTABVUE 12-17).

projected date for reopening in the Spring of 2024. Shamshiri Tr. 27:5-14 (48 TTABVUE 30). He further testified that there had been many inquiries about future availability, and that Opposer had been trying to figure out its schedule to see when it could start selling off rooms. Shamshiri Tr. 28:18-21; 29:1-8 (48 TTABVUE 31-32).[31]

Ms. Cluff testified that "[t]hroughout the purchase process, the Opposer's group have made it known that they would honor the history and legacy of the hotel and its place in Ojai. So far as I know, they have always planned to reopen the hotel under the historic name, Hotel El Roblar. They named the purchasing entity El Roblar Investment Property LLC. Like our selling entity, El Roblar Properties LP, the Opposer's LLC is named for the historic hotel." Cluff Decl. ¶ 19 (33 TTABVUE 5). Mr. Shamshiri testified in his discovery deposition that Opposer decided to use the name Hotel El Roblar because the hotel had originally been called that and Opposer's intention was to bring the hotel property back to its original glory when it opened in 1919 by using the original name. Shamshiri Tr. 12:15-13:9 (48 TTABVUE 15-16). Mr. Goode testified in his discovery deposition that no other names had been considered because "we wanted to honor the history of the property and I think the Historic Preservation, the group wanted that as well." Goode Tr. 23:2-6 (45 TTABVUE 26).

---

[31] Mr. Shamshiri explained that "we had inquiries from large groups that are hosting events down the road, whether it be a conference or, you know, we have been approached by the Ojai Valley Inn to, you know, be overflow from some of their events; and they approached us," Shamshiri Tr. 29:1-5 (48 TTABVUE 32), and that "[t]hey actually wanted to buy rooms this year, but, again, until we have a definitive opening date, we have not agreed to any of that." Shamshiri Tr. 29:6-8 (48 TTABVUE 32).

### H. The May 2020 Emails Between Opposer and Applicant

Mr. Shamshiri testified in his discovery deposition about emails between Mr. Shamshiri and Messrs. McBride, Ebbink, and Goode in early May 2020 regarding Mr. Shamshiri's draft of an email from him to Applicant inquiring about the purchase of the domain name thehotelelroblar.com. Shamshiri Tr. 50:1-58:4; Ex. 57 (48 TTABVUE 53-16; 47 TTABVUE 44-48).[32] He was seeking the input of the other members on his draft, Shamshiri Tr. 51:14-24 (48 TTABVUE 54), which we reproduce below:



Mr. Shamshiri characterized the emails among Opposer's members as "looking to see what was the path of least resistance" in obtaining the domain name thehotelelroblar.com from Applicant. Shamshiri Tr. 57:14-19 (48 TTABVUE 60).

---

[32] Mr. Shamshiri appears to have been selected to reach out to Applicant because of their longstanding friendship. Applicant testified at trial that she had been friends with Mr. Shamshiri since 2014, when she served as his realtor in connection with his sale of property in Ojai. Roe Decl. ¶¶ 60-61 (43 TTABVUE 311). Her husband testified that "Bianca and I have both known Ramin Shamshiri for quite some time and have shared many intimate moments and family gatherings at both his home and ours," that "Bianca had worked with Ramin on selling his first property in Ojai and she showed him other potential properties to develop over the years," and that "Ramin and his family were close friends and people we saw often." C. Roe Decl. ¶¶ 21-23 (4 TTABVUE 4).

Mr. Shamshiri authenticated Mr. McBride's response, which we reproduce below:

**From:** Jeremy McBride <jeremiah.mcbride@gmail.com>
**Date:** Thursday, May 7, 2020 at 8:57 PM
**To:** Ramin Shamshiri <raminpshamshiri@gmail.com>
**Cc:** Warner Ebbink <warnerebbink@gmail.com>, Eric Goode <eric@turtleconservancy.org>
**Subject:** Re: The Hotel El Roblar

THEHOTELELROBLAR.COM is the domain registered under her name (attached)

per the brokerage site I used, she wanted **$25k**, not $50k

I would add/ask the question of what she intends to do with the domain given it's the original name of the property.

Shamshiri Tr. 54:9-19 (48 TTABVUE 57). Mr. Shamshiri also authenticated his email

in response to Mr. McBride, which we reproduce below,

On Fri, May 8, 2020 at 9:40 AM Ramin Shamshiri <raminpshamshiri@gmail.com> wrote:

OK will do, so am I good to send after the changes? Should I attach the document?

I was not going to get legal until she responds aggressively.

Do we have another domain locked up in case she goes on a shopping spree?

Shamshiri Tr. 55:10-56:4 (48 TTABVUE 58-59), as well as Mr. McBride's subsequent

email in response, which we reproduce below:

On Fri, May 8, 2020 at 7:46 AM Jeremy McBride <jeremiah.mcbride@gmail.com> wrote:

yes, you can attach the document. I think that would be smart.

we have some safety on the other domains. see below as to what we have

- elroblarhotel.co
- roblarhotel.com
- theelroblar.com
- theelroblarhotel.com
- thehoteelroblarojai.com
- theroblar.com
- theroblarhotel.com

Shamshiri Tr. 56:14-57:6 (48 TTABVUE 59-60).[33]

---

[33] In amended and superseding responses to Applicant's first set of interrogatories made of record by Applicant, Opposer responded to an interrogatory from Applicant asking Opposer to identify "all domain names and websites owned or operated by Opposer that include the term El Roblar" by identifying the domain names elroblarhotel.co, roblarhotel.com, theelroblar.com, theelroblarhotel.com, thehotelelroblarojai.com, the roblar.com, and theroblarhotel.com. Amended and Superseding Resp. to Int. No. 11 (62 TTABVUE 10).

Mr. McBride approved the sending of a revised email to Applicant, and Mr. Shamshiri responded that he would send it that day. Shamshiri Tr. Ex. 57 (47 TTABVUE 47). The record does not contain a copy of the revised email that was actually sent by Mr. Shamshiri to Applicant.

On May 12, 2020, Applicant sent the email reproduced below to Mr. Shamshiri:

---

**From:** Bianca Roe <bianca@inthefieldojai.com>
**Date:** Tuesday, May 12, 2020 at 9:21 AM
**To:** Ramin Shamshiri <raminpshamshiri@gmail.com>
**Subject:** The Hotel El Roblar

Hi Ramin,

Firstly, Congratulations on your acquisition of The Oaks, we know it will be beautiful and a welcomed addition to our community.

I thought to include the entire Social Media platform that we had the foresight to secure, covering a multitude of channels, for your review.

While we have no use for them moving forward, we do believe that our time and investment is worth more than $2,500. However, in the act of good faith we're open to alternate solutions, if it is of interest to you.

Wishing the family well, these are indeed very strange times.

Best,

Bianca

Domain

thehotelelroblar.com
elroblar.com
elroblarhotel.com
elroblerhotelojai.com
hotelelroblar.com
hotelelroblarojai.com
theelroblarhotelojai.com


INSTAGRAM

Thehotelelroblar
Theelroblarhotel
Hotelelroblar
Hotelelroblarojai
Elroblarhotelojai
Elroblarhotel
Thehotelelroblarojai

FACEBOOK

The Hotel El Roblar
The El Roblar Hotel
El Roblar Hotel

TWITTER

Elroblar
Elroblarhotel

ROE_001520

Hotelelroblar
Thehotelelroblar

Bianca Roe

In the Field
730 E. Ojai ave,
Ojai CA 93023
@inthefieldojai
FB: inthefieldojai
www.inthefieldojai.com

---

Roe Tr. 91:1-92:6; Ex. 8 (26 TTABVUE 96-97; 28 TTABVUE 39-40).[34] Mr. Shamshiri testified in his discovery deposition that he believed that this email was in response to his email to Applicant. Shamshiri Tr. 41:14-21; 45:12-15 (48 TTABVUE 44, 48).

Applicant confirmed in her discovery deposition that the listed domain names were the ones that she owned relating to the applied-for mark THE HOTEL EL ROBLAR, Roe Tr. 92:22-25 (26 TTABVUE 97), and that the listed social media accounts were the ones that she "collected in 2018." Roe Tr. 93:12-17 (26 TTABVUE 98).

Mr. Shamshiri responded to Applicant's May 12, 2020 email in a May 15, 2020 email, which we reproduce below:



Roe Tr. 94:17-25; Ex. 8 (26 TTABVUE 99; 28 TTABVUE 39-40). Mr. Shamshiri testified in his discovery deposition that his request that Applicant "[l]et me know what kind of alternate solutions you would consider" was "a reference to how much do you want to -- how much are you going to charge us in layman's terms," Shamshiri Tr. 45:24-46:6 (48 TTABVUE 48-49), and that he discussed Applicant's statement in

---

[34] Applicant acquired the listed domain name hotelelroblar.com on December 3, 2019. Roe Tr. 289:21-290:9; Ex. 49 (27 TTABVUE 147-48; 29 TTABVUE 332).

her May 12, 2020 email that the domain names and social media handles were worth more than $2,500 with Messrs. McBride, Goode, and Ebbink. Shamshiri Tr. 46:7-15 (48 TTABVUE 49).

Applicant's response to Mr. Shamshiri's May 15, 2020 email is set forth in a May 18, 2020 email, which we reproduce below:

**From:** Bianca Roe <bianca@inthefieldojai.com>
**Date:** Monday, May 18, 2020 at 10:39 AM
**To:** Ramin Shamshiri <raminpshamshiri@gmail.com>
**Subject:** Re: The Hotel El Roblar

Hi Ramin,

At $2,500 it's not worth our time to explore this any further, we believe the assets to be of greater value.

If your team has to go in a different direction we understand and wish you well.

Best,

Bianca

In the Field
730 E. Ojai ave,
Ojai CA 93023
www.inthefieldojai.com
www.inthefieldinteriors.com

https://membersince.com/the-haul-in-the-field-9ee77d75a7db

http://www.architecturaldigest.com/blogs/daily/2015/01/in-the-field-opens-in-ojai-article

Roe Tr. 97:1-98:16; Ex. 9 (26 TTABVUE 102-03; 28 TTABVUE 41). When asked in her discovery deposition whether she responded to Mr. Shamshiri's question in his May 15, 2020 email regarding her "intention to use the domains for something else if we do not acquire the rights," Applicant first testified "[n]ot clearly," Roe Tr. 95:22-24 (26 TTABVUE 100), and shortly thereafter testified that she did not know or recall whether she responded. Roe Tr. 96:22-25 (26 TTABVUE 101).

Mr. Shamshiri's May 26, 2020 email in response is reproduced below:



**From:** Ramin Shamshiri <raminpshamshiri@gmail.com>
**Sent:** Tuesday, May 26, 2020 1:28 PM EDT
**To:** Bianca Roe <bianca@inthefieldojai.com>
**Subject:** Re: The Hotel El Roblar

EXHIBIT
9

Hi Bianca,

Understood, our team wants to have a third party look at it, we thought we would rather just give you the money than go through that process. We will explore that, if you change your mind let me know.

All the best,

Ramin

Roe Tr. 98:20-25; Ex. 9 (26 TTABVUE 105; 28 TTABVUE 41). Mr. Shamshiri testified in his discovery deposition that his reference to "a third party" was to counsel, Shamshiri Tr. 49:3-10 (48 TTABVUE 52), and that his statement that "we would rather just give you the money than go through that process" referred to the legal process. Shamshiri Tr. 49:14-20 (48 TTABVUE 52). Applicant testified in her discovery deposition that she did not know if she responded to this email, Roe Tr. 99:1-3 (26 TTABVUE 104), and there is no evidence of a response.

## I. Opposer's Assertion of Cybersquatting, Piracy, and Trademark Infringement Claims Against Applicant

On May 29, 2020, three days after Mr. Shamshiri's final email to Applicant, Opposer's counsel Wesley Mullen sent a letter to Applicant by email in which Opposer asserted claims against Applicant for cybersquatting, piracy, and trademark infringement. Roe Tr. 99:4-100:5; Exs. 10-11 (26 TTABVUE 104-04; 28 TTABVUE 43-45). In her discovery deposition, Applicant first testified that she did not recall receiving the letter or the email, or responding to the letter, and that she did not know if anyone responded to the letter on her behalf. Roe Tr. 99:20-101:18 (26 TTABVUE 104-06). When she was shown a subsequent letter from her counsel Chris Cohen in response to Opposer's demand letter, in which Mr. Cohen stated that "Ms. Roe provided me with a copy of your letter dated May 29, 2020, in which you accuse her of cybersquatting and trademark infringement," Roe Tr. Ex. 12 (26 TTABVUE 106-08), she acknowledged that she had received Mr. Mullen's letter, Roe Tr. 101:19-

103:18, Ex. 12 (26 TTABVUE 106-08; 28 TTABVUE 46), although she could not recall when. Roe Tr. 188:9-12 (27 TTABVUE 46).[35]

Mr. Mullen's May 29, 2020 letter on behalf of Opposer stated in pertinent part as follows:

> This Firm is litigation counsel to El Roblar Investment Property LLC, the owner of the Hotel El Roblar in Ojai, California. I write to demand that you and In The Field Ojai LLC (together, "you") immediately cease and desist the cybersquatting, piracy, and trademark infringement described below.
>
> . . .
>
> It has come to my client's attention that you and In The Field Ojai LLC (together, "you") are engaged in willful and intentional trademark infringement and cybersquatting in violation of federal and state law. Specifically, I am informed that you have purchased, reserved, and excluded my client from the use or possession of of [sic] domain names, social media accounts, and digital property associated with the valuable mark "Hotel El Roblar" and related intellectual property, including but not limited to the following:

| Web Domains | Instagram |
| --- | --- |
| thehotelelroblar.com | @Thehotelelroblar |
| elroblar.com | @Theelroblarhotel |
| elroblarhotel.com | @Hotelelroblar |
| elroblerhotelojai.com | @Hotelelroblarojai |
| hotelelroblar.com | @Elroblarhotelojai |
| hotelelroblarojai.com | @Elroblarhotel |
| theelroblarhotelojai.com | @Thehotelelroblarojai |

| Twitter | Facebook |
| --- | --- |
| @Elroblar | The Hotel El Roblar |
| @Elroblarhotel | The El Roblar Hotel |
| @Hotelelroblar | El Roblar Hotel |
| @Thehotelelroblar | |

> . . .

---

[35] Applicant later testified that she did not recall receiving Mr. Mullen's letter by email but only by regular mail, Roe Tr. 189:15-190:14 (27 TTABVUE 47-48), even though the letter bore the notation "VIA EMAIL ONLY." Roe Tr. Ex. 10 (28 TTABVUE 43).

> Please immediately relinquish these properties to my client. You may contact me at your convenience to discuss the mechanics of transfer.
>
> Failing compliance by June 17, 2020, my client will take appropriate action to remedy your unlawful conduct, and it will recover from you any legal fees incurred.
>
> My client expressly reserves all rights.

Roe Tr. Ex. 10 (28 TTABVUE 43-44).

Applicant acknowledged that she forwarded Mr. Mullen's letter to her counsel Chris Cohen, but could not recall when. Roe Tr. 188:17-189:2 (28 TTABVUE 44-45). Mr. Cohen responded on Applicant's behalf on June 10, 2020, the day after Applicant filed the opposed application, in a letter that stated as follows:

> Greetings from Ojai. I represent Bianca Roe and In the Field LLC. Ms. Roe provided me with a copy of your letter dated May 29, 2020, in which you accuse her of cybersquatting and trademark infringement. Please direct all further correspondence on this matter to me.
>
> I understand that your client is the new owner of the real property located at 122 E Ojai Ave in Ojai, California, which has been the location of The Oaks at Ojai since 1977. While there is no doubt that your client now owns that real property, it is not apparent to me that your client has any trademark rights in the brand Hotel El Roblar, which was the name of the business that occupied that same real property decades ago—and which, as I understand, has not operated in any capacity since then.
>
> Indeed, Ms. Roe has communicated with Mr. Ramin Shamshiri (who I assume is a principal of the LLC that you represent) regarding her ownership of certain web domains and social media handles that incorporate the Hotel El Roblar name. Ms. Roe acquired these before your client purchased the property, in good faith and with a bone [sic] fide intent to use that mark for hotel services—an intent that she still possesses.

> If your client is interested in purchasing those web domains and social media handles from Ms. Roe, then she is happy to consider any reasonable offer, which she can weigh against her intent to use them herself. Further, if you are able to offer any evidence of your client's preexisting rights to the Hotel El Roblar brand and mark, then she will, of course, review that information in earnest and proceed accordingly.
>
> She will not, however, be intimidated by your aggression.

Roe Tr. Ex. 12 (28 TTABVUE 46).

## J. The Filing and Prosecution of the Opposed Application

The opposed application was filed on June 9, 2020 (i.e., one day before Applicant responded to Opposer's demand letter).[36] In her trial testimony, Applicant explained the background to its filing as follows:

> It was on Sunday May 10th 2020, I [was] with my family in Palm Springs celebrating Mother's Day, my father-in-law is a property developer and had recently registered his location: *"Skyloft"* https://skyloftapts.com with the Trademark Commission. It was here I first learnt about and began the Trademark application process. Exhibit A-8 to my Declaration is a true and accurate copy of a flyer from Skyloft.

Roe Decl. ¶ 16; Ex. A-8 (43 TTABVUE 306, 36-37).[37] Applicant does not explain what she meant by "the Trademark Commission," and there is no testimony from her

---

[36] In her brief, Applicant acknowledged that "[a]t the same time [she] filed a co-pending trademark application for THE EL ROBLAR HOTEL, at Applicant [sic] Serial No. 88/956,261, for the same services under the same basis." 70 TTABVUE 10. Applicant never mentioned this application in her testimony in her discovery deposition, in her trial testimony, or in her testimony on cross-examination, but her counsel confirmed at the oral hearing that this application was ultimately abandoned.

[37] Applicant testified on cross-examination that she did not know about what she called "the Trademark application process" before she allegedly learned about it from her father-in-law. Roe Cross Tr. 32:8-10 (64 TTABVUE 35).

father-in-law about registering "his location" with that body. Exhibit A-8 to Applicant's testimony is an apartment building advertisement that bears the claimed registered mark SKYLOFT, but not the federal registration symbol ®. Roe Decl. Ex. 8 (43 TTABVUE 36-37).

Applicant testified in her discovery deposition that she filed the opposed application herself, without help from anyone else, Roe Tr. 64:8-65:10; Ex. 4 (26 TTABVUE 69-70; 28 TTABVUE 21-25), but she later testified that she was unsure if she alone worked on the prosecution of her application, Roe Tr. 81:15-84:15; Exs. 6-7 (26 TTABVUE 86-89; 28 TTABVUE 27-37), and then that she "worked with my attorney on this." Roe Tr. 84:16-18 (26 TTABVUE 89). In response to an interrogatory asking her to "[i]dentify each Person (other than Applicant) who participated in the preparation and/or filing of the Application," Applicant stated "Applicant's attorneys of record." Resp. to Int. No. 8 (29 TTABVUE 11). Mr. Cohen was formally appointed as Applicant's attorney on the application on May 25, 2021, the day on which it was published for opposition.

In her discovery deposition, Applicant first testified that she did not recall what intent she had to use the mark THE HOTEL EL ROBLAR when she filed the opposed application, Roe Tr. 75:7-12 (26 TTABVUE 80), and that she could not recall any documents that reflected her intent. Roe Tr. 75:20-24 (26 TTABVUE 80). Applicant later testified, however, that as of the June 9, 2020 filing date of the opposed application, she intended to own, lease, or otherwise occupy, use, or possess, the Topa

Vista hotel located at 1725 Maricopa Highway in Ojai. Roe Tr. 193:5-9 (27 TTABVUE 51).[38]

Applicant similarly testified at trial that her intent at the time of filing was to use the mark in connection with the Topa Vista hotel. Roe Decl. ¶ 24 (43 TTABVUE 307).[39] She claimed that she and her husband "decided on 1725 Maricopa Hwy, Ojai" as the location for their hotel because "[t]his location meets all our goals; it does not require any partnership, we can operate without third party assistance, we don't require any financial investors. We have settled on this location." Roe Decl. ¶ 24 (43 TTABVUE 307). Neither Applicant nor her husband testified as to when they had "settled on this location" prior to the filing of the opposed application.

Applicant testified in her discovery deposition that she had discussed the property at 1725 Maricopa Highway with its owner, Steve Edelson, Roe Tr. 29:21-23; 30:15-31:1 (26 TTABVUE 34-36), and that at some unspecified time, she asked Mr. Edelson if the property would be available for her to operate. Roe Tr. 31:17-20 (26 TTABVUE

---

[38] In her discovery deposition, Applicant and Opposer's counsel engaged in some colloquy based on the incorrect assumption that the opposed application was filed on June 9, 2019, not June 9, 2020. Roe Tr. 187:13-189:14; 192:3-193:14 (27 TTABVUE 45-47, 50-51). In the context of Applicant's testimony as a whole, it is clear that they were discussing counterpart dates in 2020.

[39] In her discovery deposition, Applicant testified that the hotel at 1725 Maricopa Highway was located in Meiners Oaks, a community near Ojai. Roe Tr. 27:10-15 (26 TTABVUE 32). As noted above, Exhibit 6 to Applicant's trial testimony about the property, a page from Google Maps showing the property and its location, Roe Decl. ¶ 14; Ex. A-6 (43 TTABVUE 306, 31), and Applicant's related testimony, were excluded from the record. 61 TTABVUE 11-12.

36).[40] On cross-examination, Applicant summarized her claimed interactions with

Mr. Edelson as follows:

> I was offered a lease on Maricopa Highway by the landlord. It was presented to me not signed. It was e-mailed to me. I signed it, my husband signed it, and it's been returned. After it was returned, my husband got sick. I was offered a start date of October 1st and since then, because of the state of my husband's condition, it's been postponed. I was given verbal authority to post the listings on Airbnb in order for me to actually explore if the numbers and the pricing could work for my intent, which I believe they can, and if the date – the start date was then pushed to January 1st and I'm meeting about it next week. That's my statement.

Roe Cross Tr. 39:13-25 (64 TTABVUE 42).[41]

Applicant also testified at trial that "we have begun the design phase of room

upgrades and have plans for changes" for the property at 1729 Maricopa Highway.

Roe Decl. ¶ 33 (43 TTABVUE 308). She authenticated what she described as "true

and accurate copies of pictures of the hotel rooms." Roe Decl. ¶ 35; Ex. A-20 (43

TTABVUE 308, 158-212).[42]

---

[40] Applicant described and authenticated a "Listing Summary of the location where I plan to provide hotel services under the Mark," which describes the location as a "motel." Roe Decl. ¶ 15; Ex. A-7 (43 TTABVUE 306, 32-34). LIV Sotheby's International Realty Ojai, Applicant's employer at the time of trial, is listed as the office that sold the property in February 2012. Roe Decl. Ex. A-7 (43 TTABVUE 33).

[41] Applicant was cross-examined at trial prior to the Board's ruling excluding various trial exhibits and related testimony regarding the alleged lease and Airbnb listings for the property at 1725 Maricopa Highway. As noted above, we have considered her testimony on cross-examination regarding the alleged commercial lease.

[42] The pictures in Exhibit 20 were excluded from the record to the extent that they were not previously produced by Applicant. 61 TTABVUE 8. Applicant also authenticated what she described as "true and accurate copy of my plans for upgrades to the hotel rooms," Roe Decl. ¶ 34; Ex. A-19 (43 TTABVUE 308), but Exhibit A-19 and Applicant's related testimony were excluded from the record. 61 TTABVUE 11-12.

In response to Applicant's trial testimony, Mr. Edelson testified in September 2023, prior to the Board's ruling excluding various exhibits and testimony pertaining to the property at 1725 Maricopa Highway, that he had met Applicant only twice and had not seen her in over four years, and that she "has never communicated to me an intent to operate a hotel on the property, under the name Hotel El Roblar or any other name, at any time." Edelson Decl. ¶ 9 (63 TTABVUE 3). He further testified that "I am not Ms. Roe's landlord, she is not my tenant, and I never signed this document," Edelson Decl. ¶ 4 (63 TTABVUE 2),[43] that Applicant "has no right to list any part of the property at 1725 Maricopa Highway on Air BnB,"[44] and that Applicant has never rented any property from him, including the property at 1725 Maricopa Highway. Edelson Decl. ¶¶ 6-8 (63 TTABVUE 3).

## K. The Civil Litigation Involving the Parties

On May 19, 2021, about 11 months after the parties exchanged letters regarding Opposer's claims, Opposer filed suit in the United States District Court for the Central District of California in Los Angeles against Applicant and her company In the Field Ojai LLC, asserting claims of unfair competition, cybersquatting, trademark dilution, common law unfair competition, and common law conversion. Shamshiri Tr. 33:15-34:12; Ex. 55 (48 TTABVUE 36-37; 47 TTABVUE 29-42).

---

[43] Mr. Edelson's testimony regarding "this document" refers to the lease document that was subsequently excluded from the record. 61 TTABVUE 11-12.

[44] Applicant's alleged Airbnb listings regarding the 1725 Maricopa Highway location in Exhibit A-2 to her trial testimony were excluded from the record. 61 TTABVUE 11-12.

It is not clear exactly what occurred between the parties' exchange of letters in June 2020 and the filing of the suit in May 2021, or what the parties did to try to resolve their dispute during that period or thereafter. In connection with the parties' January 14, 2022 discovery conference in this case, the assigned Board Interlocutory Attorney stated in his order summarizing the conference that in response to an inquiry to the parties "as to whether the parties have previously engaged in settlement discussions," Opposer "noted extensive settlement discussions between the parties directly surrounding the district court action and that communication between the parties remains open," but that " Opposer saw no need to delay discovery in this matter for the purpose of settlement in view of the little progress made thus far and requested that this matter proceed in accordance with the current schedule." 11 TTABVUE 2.

In any event, Applicant moved to dismiss Opposer's complaint in the civil action on the ground that it failed to state claims upon which relief could be granted. Roe Decl. ¶ 70 (43 TTABVUE 312). The District Court granted the motion on August 25, 2021, and gave Opposer leave to replead. Roe Decl. ¶ 70; Ex. A-28 (43 TTABVUE 312, 251-54).[45] Opposer apparently did not replead its claims, and the case was dismissed

---

[45] The District Court stated in its minute order dismissing the pleaded claims that Opposer "alleges it is the 'owner of the Hotel El Roblar marks and brand,' that '[t]he name 'Hotel El Roblar' is an inherently distinctive mark,' and that '[t]he public identifies the Hotel El Roblar name with the iconic property owned by the Plaintiff in Ojai, California.' . . . Defendants complain these allegations fail to establish which marks are at issue and present mere legal conclusions, rather than facts which can support a claim for relief. The Court agrees that Plaintiff's allegations are legal conclusions, but Plaintiff does identify 'Hotel El Roblar' as the mark at issue. At present, Plaintiff's allegations only show a possibility, rather than a plausibility, that they own the 'Hotel El Roblar' mark. While Plaintiff may own the property,

without prejudice in September 2021. 11 TTABVUE 2. This opposition was filed the next month.

### III. Opposer's Entitlement to a Statutory Cause of Action

"Entitlement to a statutory cause of action is an element of the plaintiff's case in every inter partes proceeding." *Mystery Ranch, Ltd. v. Terminal Moraine Inc.*, Opp. No. 91250565, 2022 WL 17369425, at *6 (TTAB 2022) (cleaned up) (citing *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 1303-07 (Fed. Cir. 2020)).

Section 13 of the Trademark Act, 15 U.S.C. § 1063, "provides that '[a]ny person who believes that he would be damaged by the registration of a mark . . . may . . . file an opposition' with the USPTO . . . ." *Curtin v. United Trademark Holdings, Inc.*, 137 F.4th 1359, 1362 (Fed. Cir. 2025) (citing 15 U.S.C. § 1063). "[A] plaintiff may oppose registration of a mark when (1) [its] interests are within the zone of interests protected by the statute [(i.e., it has a 'real interest' in the outcome of the proceeding)] and (2) [it] has a reasonable belief in damage that would be proximately caused by registration of the mark in violation of the opposition statute." *Id.* at 1367 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-34 (2014)); *see also Australian Therapeutic Supplies Pty Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 1373-74 (Fed. Cir. 2020); *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 1275 (Fed. Cir. 2014)); *Tequila Cuadra S. de RL de CV v. Manufacturera De*

---

as the Grant Deeds show, upon which Hotel El Roblar once sat or currently sits, that ownership does not necessarily establish they own any related marks or that such marks exist. By failing to sufficiently allege well-pleaded facts of the existence, ownership, and use of the 'Hotel El Roblar' mark, Plaintiff fails to satisfy the federal pleading standard as to all of its claims." August 25, 2021 Minute Order at 4 (43 TTABVUE 254).

*Botas Cuadra, S.A. de C.V.*, Opp. No. 91282327, 2025 WL 1431504, at \*4 (TTAB 2025) (citing *Meenaxi Enter., Inc. v. Coca-Cola Co.*, 38 F.4th 1067, 1070 (Fed. Cir. 2022) (citing *Lexmark*, 572 U.S. 118, 129, 132)); *Corcamore*, 978 F.3d at 1303-07).

Opposer argues in its main brief that "[e]ntitlement to a statutory cause of action can be established through, among other things, a 'reasonable belief' that the opposer 'will be or is being damaged by the false suggestion of a connection between a person and the challenged mark.'" 67 TTABVUE 19 (quoting *Piano Factory Grp., Inc. v. Schiedmayer Celesta GmbH*, 11 F.4th 1363, 1376 (Fed. Cir. 2021)). According to Opposer, it "is entitled to a statutory cause of action because, as the owner of the historic Hotel El Roblar, it has a real interest in Applicant's attempt to register 'the hotel el roblar' as a mark" and because it "owns the Hotel El Roblar and reasonably believes it will be damaged by false association unless its opposition to registration of the proposed mark 'the hotel el roblar' is sustained." *Id.* (citations omitted). Finally, Opposer argues that "assuming Applicant's testimony and statements in her application were true, Opposer and Applicant would be competitors in the market for hotel services." *Id.* (citation omitted).

Applicant responds that

> Opposer failed to provide any documentary evidence showing use by Opposer in the United States commerce of its alleged common-law trademark or that it owns a historical institution called THE HOTEL EL ROBLAR. Opposer claims in its brief that it has worked to restore a historic property, but has not provided any documentary evidence that it has actually used the mark THE HOTEL EL ROBLAR in United States Commerce. In fact, even Opposer's website states "We are opening our doors soon." . . . This signifies Opposer does not have an active

trademark, common law or otherwise. Opposer has alleged it is the owner of "the Hotel El Roblar", however, this is simply not true. Opposer acquired the property located at 122 E Ojai Ave, Ojai . . . but has not yet provided hotel services nor did it acquire any brand under "the Hotel El Roblar." . . . Opposer does not obtain standing merely by being a competitor in the marketplace, there must be a basis for damages. Opposer has no trademark that would cause confusion with Applicant's Mark, Opposer has not proven THE HOTEL EL ROBLAR is a historical institution. As such, Opposer lacks standing.

Here, Opposer and Applicant already had a court of competent jurisdiction determine Opposer does not own a trademark. The U.S. District Court for the Central District of California held, "While Plaintiff may own the property, as the Grant Deeds show, upon which Hotel El Roblar once sat or currently sits, that ownership does not necessarily establish they own any related marks or that such marks exist. By failing to sufficiently allege well-pleaded facts of the existence, ownership, and use of the 'Hotel El Roblar' mark . . . ." Opposer does not own a trademark, and its ownership is merely to a piece of real property. Opposer did not acquire any trademark rights when it purchased the Location let alone rights to the name THE HOTEL EL ROBLAR.

Opposer lacks standing to bring this opposition because it has failed to demonstrate any ownership of a trademark or proprietary rights that would confer a "real interest" in this proceeding. The Board has consistently held that mere competition is insufficient to establish standing. As such, without evidence supporting a legitimate trademark interest or a reasonable belief in potential damage, the Opposer does not meet the requisite standard for standing.

70 TTABVUE 11-12 (citations omitted).[46]

---

[46] Both parties refer to Opposer's "standing" to oppose. "We now refer to standing as entitlement to a statutory cause of action." *Univ. of Ky. v. 40-0, LLC*, Opp. No. 91224310, 2021 WL 839189, at *4 (TTAB 2021). "Despite the change in nomenclature, our prior decisions and those of the U.S. Court of Appeals for the Federal Circuit [addressing standing] remain equally applicable." *Id.*

In its reply brief, Opposer argues that it "intends to offer hotel services there under the very same mark Applicant seeks to register in connection with hotel services," 71 TTABVUE 7, and that Opposer "has standing for at least three reasons, any one of which is sufficient." *Id.* at 8. First, Opposer argues that it is a "'potential competitor to Applicant' in the market for hotel services," *id.* (quoting *Mystery Ranch*, 2022 WL 17369425, at *9), and that the "parties' competitor status is sufficient to establish standing, especially because Applicant seeks to use the very same mark as Opposer in connection with her purported competing hotel business." *Id.*

Second, Opposer argues that it "'has a present or prospective interest' in using the proposed Mark 'in its business,'" *id.* (quoting *Univ. of Ky.*, 2021 WL 839189, at *6), because it "intends to use the mark THE HOTEL EL ROBLAR in connection with its luxury hotel business at the site of the historic Hotel El Roblar in Ojai, California." *Id.*

Third, Opposer repeats its argument that because it "owns the Hotel El Roblar, it has a 'reasonable belief that it will be [and] is being damaged by the false suggestion of a connection between [the hotel] and the challenged mark[,]' 'the hotel el roblar.'" *Id.* at 9.

We agree with Opposer that it is entitled to oppose Applicant's application. Although a plaintiff's entitlement to a statutory cause of action is a threshold issue, "it is 'a low threshold, intended only to ensure that the plaintiff has a real interest in the matter, and is not a mere intermeddler.'" *Univ. of Ky.*, 2021 WL 839189, at *6 (quoting *Syngenta Crop Prot., Inc. v. Bio-Chek, LLC*, Opp. No. 91175091, 2009 WL

691309, at *5 n.8 (TTAB 2009) (internal citation omitted)). "The real interest requirement is meant to prevent litigation where there is no real controversy between the parties, 'where a plaintiff, petitioner or opposer, is no more than an intermeddler.'" *Australian Therapeutic Supplies*, 965 F.3d at 1376 (quoting *Jewelers Vigilance Comm., Inc. v. Ullenberg Corp.*, 823 F.2d 490, 492 (Fed. Cir. 1987)). As the Federal Circuit explained in *Curtin*, "[i]n *Corcamore*, this court specified 'that the purpose of the zone-of-interests test is to foreclose[ ] suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue.'" *Curtin*, 137 F.4th at 1367 (quoting *Corcamore*, 978 F.3d at 1303 (quoting *Lexmark*, 572 U.S. at 130, 134)).

In *Curtin*, the Federal Circuit held that entitlement must be evaluated with reference to the ground(s) for opposition asserted by the opposer. *Id.* at 1366-67. We focus on whether Opposer is statutorily entitled to bring its claim that Applicant lacked a bona fide intention to use the mark THE HOTEL EL ROBLAR in commerce for hotel services when she filed the opposed application under Section 1(b) of the Trademark Act.[47] If Opposer demonstrates its entitlement to bring this claim, it also is statutorily entitled to bring its false suggestion of a connection claim under Trademark Act Section 2(a). *Tequila Cuadra*, 2025 WL 1431504, at *5 ("[O]nce an

---

[47] "An opposer is 'entitled to rely on any statutory ground which negates [an applicant's] right to the subject registration[.]'" *M.Z. Berger & Co. v. Swatch AG*, 787 F.3d 1368, 1375 (Fed. Cir. 2015) (quoting *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 1031 (CCPA 1982) (internal citation omitted)). "Because a bona fide intent to use the mark in commerce is a statutory requirement of a valid intent-to-use trademark application under Section 1(b), the lack of such intent is a basis on which an opposer may challenge an applicant's mark." *Id.*

opposer meets the requirements for [statutory entitlement as to one claim], it can rely on any of the statutory grounds for opposition set forth in [the Trademark Act].") (quoting *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1377 (Fed. Cir. 2012)).

Contrary to Applicant's arguments, Opposer does not have to assert a proprietary interest in the mark THE HOTEL EL ROBLAR because "[a]n absence of proprietary rights does not in itself negate an interest in the proceeding or a reasonable belief of damage." *Australian Therapeutic Supplies*, 965 F.3d at 1372. Opposer may "demonstrat[e] a real interest in the [opposition] proceeding and a reasonable belief of damage regardless of whether [Opposer] lacks a proprietary interest in an asserted unregistered mark." *Id.*

"Opposer may prove its entitlement by establishing that it has a present or prospective interest in using the [mark] in its business," *Univ. of Ky.*, 2021 WL 839189, at *6, as an actual or prospective competitor of Applicant. We hold that these principles apply to Opposer's claim under Section 1(b) of the Trademark Act that Applicant lacked a bona fide intention to use the mark THE HOTEL EL ROBLAR in commerce for hotel services when she filed the opposed application.

"The real interest requirement is meant to prevent litigation where there is no real controversy between the parties, 'where a plaintiff, petitioner or opposer, is no more than an intermeddler.'" *Australian Therapeutic Supplies*, 965 F.3d at 1376 (quoting *Jewelers Vigilance Comm.*, 823 F.2d at 492). In *Australian Therapeutic Supplies*, the Federal Circuit did not define a "minimum threshold of commercial

activity" required of a plaintiff to show a real interest in a proceeding, and a reasonable belief in damage proximately caused by registration of the involved mark, *id.*, but there is no doubt here that Opposer has engaged in sufficient commercial activity to show that it is more than an intermeddler in its opposition to Applicant's registration of the mark THE HOTEL EL ROBLAR for hotel services.[48]

As discussed in detail above, the record shows that at the time the notice of opposition was filed, Opposer's trade name included the words "El Roblar," that Opposer had registered multiple domain names containing those words, and that Opposer intended to use the Hotel El Roblar as the name of its new hotel; and that by the time of trial, Opposer was operating a website bearing the words "the hotel el roblar" in script and the words "Hotel El Roblar" in typed font, and stating that "[w]e are opening our doors soon,"[49] and had taken multiple steps to enable it to offer hotel services under the mark the Hotel El Roblar in the near future in Ojai, the same place where Applicant claims that she intends to offer the same services under the same mark. *See Philanthropist.com, Inc. v. Gen. Conf. Corp. of Seventh-Day Adventists*, Canc. No. 92065178, 2021 WL 2472776, at \*4 (TTAB 2021) (plaintiff must prove

---

[48] We have previously held that these principles apply with respect to a false suggestion of a connection claim under Section 2(a) of the Trademark Act. *Mystery Ranch*, 2022 WL 17369425, at \*9 (finding that the opposer's "advertised status as a potential competitor to Applicant" supported its statutory entitlement to bring its Section 2(a) claim); *see also Piano Factory*, 11 F.4th at 1376 ("A party asserting a false association bar to registration under section 2(a) need not have proprietary rights to a name as long as the party has a reasonable belief that it will be or is being damaged by the false suggestion of a connection between a person and the challenged mark.").

[49] Opposer's website has been available to the public since at least 2023 and, as discussed above, Opposer has already received inquiries regarding the availability of its hotel services under the mark the Hotel El Roblar.

entitlement to a statutory cause of action for the entirety of the proceeding, from commencement until the end), *aff'd mem.*, 2022 WL 3147202 (Fed. Cir. Aug. 8, 2022).

We find that Opposer has a real interest in the proceeding, beyond that of an intermeddler, in preventing Applicant's registration of THE HOTEL EL ROBLAR, and that Opposer has satisfied the first element of its showing that it is entitled to bring both of its claims.

Opposer has also shown "damage proximately caused by the proposed registration (i.e., a reasonable basis for its belief in damage)," *Tequila Cuadra*, 2025 WL 1431504, at *4, in the event that Applicant registers the mark THE HOTEL EL ROBLAR for hotel services. It is self-evident that if Applicant obtains the exclusive nationwide right to use the mark THE HOTEL EL ROBLAR for hotel services based on what Applicant claims will be use of the mark in Ojai, Opposer's use of the same mark for the same services in the same city would be at risk, especially against the backdrop of the parties' litigation history.[50]

We find that Opposer has shown a statutory entitlement to assert both of its claims. We turn now to Opposer's claim that Applicant lacked a bona fide intention to use the mark THE HOTEL EL ROBLAR in commerce for hotel services when she filed the opposed application on June 9, 2020.

---

[50] Applicant's counsel admitted as much at the oral hearing.

## IV. Opposer's Claim That Applicant Lacked a Bona Fide Intention to Use the Mark THE HOTEL EL ROBLAR for Hotel Services When She Filed the Opposed Application

### A. Applicable Law

Trademark Act Section 1(b) provides as follows:

> A person who has a bona fide intention, under circumstances showing the good faith of such person, to use a trademark in commerce may request registration of its trademark on the principal register hereby established by paying the prescribed fee and filing in the Patent and Trademark Office an application and a verified statement, in such form as may be prescribed by the Director.

15 U.S.C. § 1051(b).

"Because a bona fide intent to use the mark in commerce is a statutory requirement of a valid intent-to-use trademark application under [Trademark Act] Section 1(b), the lack of such intent is a basis on which an opposer may challenge an applicant's mark." *Tequila Cuadra*, 2025 WL 1431504, at *5 (quoting *M.Z. Berger*, 787 F.3d at 1375).

"A determination of whether an applicant has a bona fide intention to use the mark in commerce is an objective determination based on all the circumstances." *Id.* (quoting *Bos. Red Sox Baseball Club Ltd. P'ship v. Sherman*, Opp. No. 91172268, 2008 WL 4149008, at *6 (TTAB 2008) (citing *Lane Ltd. v. Jackson Int'l Trading Co.*, Opp. No. 91092025, 1994 WL 740491, at *6 (TTAB 1994)). "The central inquiry in a lack of bona fide intent to use claim is whether at the time of filing the application 'the applicant's intent to use the mark was firm and not merely intent to reserve a right in a mark.'" *Id.* (quoting *Tiger Lily Ventures Ltd. v. Barclays Cap. Inc.*, 35 F.4th

1352, 1365 (Fed. Cir. 2022) (quoting *M.Z. Berger*, 787 F.3d at 1376) (internal quotation marks omitted)).

"The particular facts of each case must be carefully considered in their totality, but generally, the strongest documentary proof will have been created prior to, or at the latest on, the filing date of the intent-to-use application." *Société Des Produits Nestle S.A. v. Cándido Viñuales Taboada*, Opp. No. 91232597, 2020 WL 4530518, at *16 (TTAB 2020) (citing *Swiss Grill Ltd. v. Wolf Steel Ltd.*, Opp. No. 91206859, 2015 WL 5675642, at *9 (TTAB 2015)). "In contrast, a long gap between the filing of an application and the activities asserted to demonstrate bona fide intent tends to undercut an inference that the applicant actually had a bona fide intent to use the mark." *Id.*

"Opposer has the initial burden of demonstrating by a preponderance of the evidence that [A]pplicant lacked a bona fide intent to use the mark on the identified [services on the filing date of her application]." *Tequila Cuadra*, 2025 WL 1431504, at *6 (quoting *Bos. Red Sox Baseball Club*, 2008 WL 4149008, at *6). "The absence of any documentary evidence on the part of [Applicant] regarding such intent constitutes objective proof sufficient to prove that [she] lack[ed] a bona fide intention to . . . use [her] mark in commerce." *Id.* (quoting *Bos. Red Sox Baseball Club*, 2008 WL 414908, at *6) (citing *Commodore Elecs. Ltd. v. CBM K.K.*, Opp. No. 91086336, 1993 WL 156479, at *5 (TTAB 1993)). If Opposer establishes a prima facie case, the burden shifts to Applicant "to rebut that prima facie case by producing evidence which would establish that [she] had the requisite bona fide intent to use the mark

when [she] filed [her] application." *Id.* (citing *Saul Zaentz Co. v. Bumb*, Opp. No. 91156452, 2010 WL 2783893, at \*6 (TTAB 2010); *Bos. Red Sox Baseball Club*, 2008 WL 4149008, at \*6; *Commodore Elecs.*, 1993 WL 156479, at \*5 n.11).

> The evidentiary bar for showing bona fide intent to use is not high, but more is required than "a mere subjective belief." *M.Z. Berger & Co.*, 787 F.3d at 1375. The objective evidence must indicate an intention to use the mark that is "firm" and "demonstrable." *Id.* at 1375-76. In other words, Applicant's evidence bearing on [her] bona fide intent must be "objective" in the sense that it consists of real-life facts and Applicant's actions, as opposed to Applicant's uncorroborated testimony as to [her] subjective state of mind. *See* 2 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 19:14 (5th ed. Feb. 2025 update) ("Congress did not intend the issue to be resolved simply by an officer of the applicant later testifying, 'Yes, indeed, at the time we filed that application, I did truly intend to use the mark at some time in the future.'").

*Id.*

## B.    Summary of the Parties' Arguments

Opposer first argues that Applicant does not offer any documentary evidence of her intent as of the June 9, 2020 filing date of her application, 67 TTABVUE 20, and that a few weeks before the filing date, Applicant "admitted in writing that she had 'no use' for the Mark 'going forward,'" *id.* at 21, citing Applicant's May 12, 2020 email to Mr. Shamshiri. According to Opposer, that email "is independently dispositive of Applicant's intent as of the filing date," *id.*, because Applicant "unambiguously admitt[ed] that she lacked intent to use the proposed Mark 'the hotel el roblar' in commerce on May 12, 2020." *Id.* at 24.

Opposer next summarizes Applicant's unsuccessful attempt to purchase the property at 122 East Ojai Avenue, *id.* at 22-23, and argues that

> [o]nce she lost her bid, there is no evidence at all that Ms. Roe took **any** action to use the proposed Mark. She failed to use the domain names and social media handles she had registered in August 2018 for a hotel or any other project — using the Mark or otherwise — and she admits that those digital properties were her only investment in the proposed Mark.

*Id.* (record citations omitted; emphasis in bold here in italics in the original).

Opposer further argues that

> In fact, in the **more than four years** that elapsed between August 2018 — when she reserved the domain names and social media handles related to the proposed Mark — and September 2022 — when she testified at her discovery deposition in this Proceeding — Ms. Roe posted no content on any of the Hotel El Roblar websites . . . and none on the social media accounts . . . . The Hotel El Roblar-related websites and social media accounts that Ms. Roe occupied therefore sat empty. They were empty because Ms. Roe had lost her bid to purchase the Hotel El Roblar, and because once she lost, she had no intent to use the Mark, or any related digital content, in connection with any hotel or other business.

*Id.* at 23 (record citations omitted; emphasis in bold here in italics in the original).

Opposer also argues that in 2019 and 2020, Applicant "took no action to offer hotel services under the proposed Mark at any location or in connection with any business enterprise." *Id.*

Opposer argues that after sending her May 12, 2020 email to Mr. Shamshiri, Applicant

> filed the application less than a month later, on June 9, 2020. There is no evidence — much less documentary evidence — to suggest she developed a bona fide intent to

> use the Mark in connection with hotel services between May 12, 2020 (when she admitted she had no intent) and June 9, 2020 (when she filed the application). Instead, Ms. Roe's May 12, 2020 admission lays bare that she filed her application **without** the requisite bona fide intent — but rather "merely to reserve a right in a mark" that the Opposer might compensate her to relinquish.

*Id.* at 24 (citations omitted; emphasis in bold here in italics in the original).

Opposer next argues that "[e]ven if Applicant's written admission were not dispositive, the opposition must still be sustained because Applicant has failed to carry her burden to offer documentary evidence establishing a bona fide intent to use the mark in commerce." *Id.* (citation omitted). Opposer critiques Applicant's Airbnb listing with respect to her Los Angeles property; her domain name registrations; her correspondence with Ms. Jorgensen regarding an SBA loan; her photographs of motel rooms; and other documentary evidence in the form of Exhibits A-21-A-30 to Applicant's trial testimony. *Id.* at 25-30. Opposer concludes that "[e]xamining Applicant's evidence on a document-by-document basis, the record is utterly devoid of documentary evidence that might establish Applicant's bona fide intent to use the Mark on the date of the application." *Id.* at 30.

Opposer then attacks Applicant's and her husband's trial testimony, *id.* at 30-36, and, as noted above, discusses two exhibits to Applicant's trial testimony that were excluded from the record prior to trial. *Id.* at 31-33, 36. Opposer concludes that "the combined testimony of Applicant and Mr. Roe do not establish — and indeed further disprove — that Ms. Roe had the requisite bona fide intent on June 9, 2020." *Id.* at 36.

Opposer next argues that "Applicant has provided no credible evidence that she is capable of offering the hotel services at issue in the application. Her position in this Proceeding appears to be based on the fanciful view that listing rooms on the homesharing website airbnb.com amounts to 'hotel services.'" *Id.* at 37. Opposer argues that providing rentals through Airbnb does not equate to rendering "hotel services," but that even if it does, Applicant has been in violation of the law in providing those rentals and has never used the mark THE HOTEL EL ROBLAR in connection with Airbnb. *Id.* at 37-38.

Finally, Opposer argues that Applicant's conduct and testimony lack good faith and are "fraudulent." *Id.* at 38. Opposer claims that "Applicant's conduct before, during and after this Proceeding, make clear that her credibility is incompatible with a finding of statutory good faith," *id.* at 39, and that "during the trial of this Proceeding Ms. Roe has given provably false testimony, and offered in evidence demonstrably manipulated documents, in a manner that cannot be anything but intentional." *Id.* at 40.

Applicant responds that "Opposer's argument ignores that fact that [it is] Opposer itself that must first establish evidence of Applicant's lack of *bona fide* intent to use its [sic] mark before Applicant is required to bring forth evidence to the contrary," and that "Opposer has failed to demonstrate that Applicant has no documentary evidence of its [sic] *bona fide* intent to use, or indeed any evidence relevant to whether Applicant has a bona fide intent to use the mark THE HOTEL EL ROBLAR on the

[services] in the application, and so has failed in its burden of proof." 70 TTABVUE 14.

Applicant first addresses her May 12, 2020 email to Mr. Shamshiri. She argues that

> an appropriate review of the email reveals Opposer['s] misstatement of the evidence. The email states, "Congratulations on your acquisition of **The Oaks**, we know it will be beautiful and a welcomed addition to our community. I thought to include the **entire Social Media** platform that we had the foresight to secure, covering a multitude of channels, for your review. While we have no use for them moving forward, we do believe that our time and investment is worth more than $2,500. However, in the act of good faith we're open to alternate solutions, if it is of interest to you. Wishing the family well, these are indeed very strange times.["] . . . . It is clear from this evidence that (1) Applicant was engaged in a settlement discussion with Opposer; (2) Applicant reviewed [sic] the Opposer's purchase as The Oaks, not the Hotel El Roblar, and (3) Applicant's focus was on social media, not the trademark or hotel services moving forward. This isolated email is insufficient to establish a lack of intent, especially given Applicant's continued efforts to build her hotel services following the failed settlement.
>
> Moreover, [in] the context of the email, "them" specifically refers to social media accounts, not the trademark or hotel services associated with the mark itself. Applicant's reference to "them" clearly concerns social media assets previously created and maintained. This distinction invalidates the Opposer's argument that the email implies abandonment of the trademark or lack of intent to use the Mark in connection with hotel services.
>
> Ultimately, this email was clearly intended for settlement purposes. The email in question was sent as part of a settlement negotiation with the Opposer. The context of these discussions is crucial because statements made in settlement do not necessarily reflect a party's intentions regarding trademark use.

*Id.* at 15 (citations omitted; emphasis supplied by Applicant).

Applicant next argues that

> even if the Board determines Opposer has met its burden, Applicant has present[ed] uncontroverted proof of her intentions to use Applicant's Mark, including documents produced after [the] filing of Applicant's Application, which as stated above, the Board can take into consideration. Applicant has provided evidence that she is providing hotel services under her AirBNB listings.
>
> . . .
>
> Evidence of business planning, preparatory steps, or actual steps to bring the product or service to market strongly supports a bona fide intent. The absence of clear actions could suggest a lack of bona fide intent, but here, the Applicant has taken concrete steps indicating otherwise. These actions clearly differentiate the Applicant's intent from mere intent to reserve a mark, satisfying the TTAB's standards for bona fide intent to use.

*Id.* at 16.

Applicant argues that she conducted a pre-filing search, and purchased various social media handles, but that "because of COVID, efforts to secure a property, other than AirBNB listings interrupted Applicant's plans," and that "[a]ll these actions occurred prior to the filing of Applicant's application for Applicant's Mark." *Id.*

With respect to post-filing activities, Applicant acknowledges that she "has not offered her hotel services under the actual name, THE HOTEL EL ROBLAR since filing of the application," but argues that this is excusable because of the Covid-19 pandemic, the civil suit filed by Opposer and dismissed in 2021, and this opposition. *Id.* Applicant also discusses the conflicting testimony regarding the hotel property at 1725 Maricopa Highway in Ojai, and argues that it shows that "Applicant and Mr.

Edelson engaged in good-faith negotiations regarding leasing of the property at 1725 Maricopa Highway." *Id.* at 19.[51]

Applicant concludes that

> Opposer has failed to meet its burden to demonstrate, by a preponderance of the evidence, that Applicant lacked a bona fide intent to use the mark in commerce. Opposer's reliance on isolated and mischaracterized evidence does not establish the absence of intent, particularly in light of Applicant's documented preparations, consistent narrative, and extensive evidence submitted to the Board. The record clearly shows that Applicant undertook concrete, affirmative steps toward using the mark, actions that far exceed a mere intent to reserve rights. This genuine commitment to bringing the mark to market aligns fully with the Boards [sic] standards. Accordingly, Opposer's claim lacks merit and should be dismissed with prejudice, allowing Applicant's mark to proceed to registration as intended.

*Id.* at 19-20.

In its reply brief, Opposer argues generally that "[t]here is no documentary evidence to support Applicant's claim of intent," and that "the burden was on Applicant to come forward in her Trial Brief with documentary evidence of intent — or evidence adequately explaining or outweighing that failure. . . . Here, there is none of either." 71 TTABVUE 11. Opposer argues that "Applicant cites the trial record only eight times to support her assertions that she 'had the requisite bona fide intent to

---

[51] In a footnote, Applicant argues that the fact that Opposer obtained Mr. Edelson's testimony is "yet another attempt at Opposer's harassment and interference with Applicant's business" and that "[f]ollowing Opposer's interrogation of Mr. Edelson, discussions with Applicant have deteriorated and led to conflicts surrounding the lease." 70 TTABVUE 19 n.3. Applicant did not cross-examine Mr. Edelson, and there is no record evidence supporting Applicant's claim regarding any subsequent "discussions with Applicant."

use The Hotel El Roblar mark at the time she filed her application'," *id.* at 13 (citing

70 TTABVUE 12-19), and proceeds to discuss those eight citations. *Id.* at 13-17.

With respect to Applicant's May 12, 2020 email to Mr. Shamshiri, Opposer argues

that "Applicant's attempts to escape her written admission that she did not intend to

use the 'the hotel el roblar'— made in an email just prior to filing her application —

are not credible." *Id.* at 17. Opposer first argues that "[t]he email at issue is plainly

not a settlement communication; it bears no settlement or confidentiality notice or

citation to any evidentiary rule; nor does it discuss a resolution of a dispute." *Id.*

According to Opposer, the email is instead "an attempt by Applicant to induce one of

Opposer's principals to pay the Applicant to relinquish various social media handles

and domain names, 'because [she] ha[d] no use for them going forward,' having failed

to purchase the Hotel El Roblar property." *Id.* Opposer next argues that "once

Applicant lost the auction for the historic Hotel El Roblar property, she had 'no use'

for Hotel El Roblar (not The Oaks) social media accounts." *Id.* at 17-18.

Finally, Opposer argues that

> Applicant contends that "Applicant's focus [in her admission email] was on social media, not the trademark or hotel services moving forward." . . . Applicant thus argues that she had an intention to provide hotel services under name "the hotel el roblar" while at the very same time she had "no use" for The Hotel El Roblar social media accounts. Or put another way, Applicant sought to unload the domain names for the very hotel and Mark she claims (without documentary evidence) she intended to develop. That assertion is not credible.

*Id.* at 18 (citations omitted).

## C.   Analysis

We must measure Applicant's intent when she filed the opposed application on June 9, 2020 "by an objective standard," *Tiger Lily Ventures*, 35 F.4th at 1364, based "on objective evidence of intent" and taking into consideration "the totality of the circumstances." *Id.* at 1365 (quotation and quotation marks omitted). Evidence "must be 'objective' in the sense that it consists of real-life facts and Applicant's actions, as opposed to Applicant's uncorroborated testimony as to [her] subjective state of mind." *Tequila Cuadra*, 2025 WL 1431504, at *6.

"Opposer has the initial burden of demonstrating by a preponderance of the evidence that [A]pplicant lacked a bona fide intent to use the mark on the identified [services] [on the filing date of her application]." *Id.* Opposer argues that it has carried that burden because "Applicant offers no documentary evidence of intent." 67 TTABVUE 20. We disagree to the extent that Opposer claims that Applicant offered no documentary evidence of her intent at any time prior to the filing of the opposed application. As discussed in detail above, there is extensive documentary evidence, including texts, emails, letters, documents reflecting Applicant's purchase of domain names, projections, a draft business plan, and several proposals to purchase the property at 122 East Ojai Avenue, showing that from mid-2018 until January 21, 2019, Applicant intended to use the mark THE HOTEL EL ROBLAR in connection with a hotel on that property if she was able to buy it.[52]

---

[52] Applicant's testimony in her discovery deposition that she chose the mark THE HOTEL EL ROBLAR simply because it was a "good idea," and that she did not recall where she got

As discussed above, however, she was not able to buy it, and she admitted in her discovery deposition that her intent to offer hotel services at the property at 122 East Ojai Avenue ended when her purchase bid was rejected. Roe Tr. 145:14-19 (26 TTABVUE 150). Just as the evidence establishes that between mid-2018 and January 21, 2019, Applicant intended to use the mark THE HOTEL EL ROBLAR in connection with a hotel at 122 East Ojai Avenue, there is no doubt that after January 21, 2019, Applicant no longer had that intent.

The issue here is, of course, not Applicant's intent on January 21, 2019, but rather her intent almost a year-and-a-half later, when she filed the opposed application on June 9, 2020. We must determine whether Applicant had a bona fide intention to use the mark in commerce at the time of filing the application, taking into account the totality of the circumstances.

Ms. Cluff testified that Applicant never indicated to her that Applicant intended to use the mark with any other properties. Cluff Decl. ¶ 20 (33 TTABVUE 5); Roe Tr. 138:11-16 (26 TTABVUE 143); Roe Tr. 138:17-139:1 (26 TTABVUE 143-44). Given her extensive efforts to buy the property at 122 East Ojai Avenue, Applicant was surely very disappointed to lose her bid,[53] but she stated shortly thereafter that she

_____

that "good idea," Roe Tr. 169:22-170:10 (27 TTABVUE 27-28), is not credible. There is no doubt that she got the idea to use the mark in the course of attempting to purchase the property at 122 East Ojai Avenue, a location at which she knew that a hotel had once operated under that mark.

[53] As Applicant's husband put it in his testimony, "The Oaks [at] Ojai was by far at that point in our journey of potential hotels the best scenario we had seen. The history of the property its location and an opportunity to do something in Ojai where we lived and already had a thriving business was truly a dream." C. Roe Decl. ¶ 20 (44 TTABVUE 4).

was moving on to other endeavors. She told Butler Consultants on January 19, 2019 that "**I'd like to use the money paid towards a different Buisness [sic] plan, one for our retail store and bar/event space for SBA loan financing**," Roe Tr. 242:21-243:4; Ex. 29 (27 TTABVUE 100-01; 29 TTABVUE 229) (emphasis added), and a few days later, she told her loan broker that "**I have a Retail Business in Ojai that we will now focus all off [sic] our efforts towards**, would you let me know what areas SBA finances?" Roe Tr. 245:4-247:20; Ex. 31 (27 TTABVUE 103-05; 29 TTABVUE 234) (emphasis added).[54]

Notwithstanding these statements suggesting that she was done with trying to run a hotel, both Applicant and her husband testified at trial that Applicant intended to use the mark THE HOTEL EL ROBLAR in connection with the hotel on the property at 1725 Maricopa Highway. Roe Decl. ¶¶ 24, 30 (43 TTABVUE 307-08); C. Roe Decl. ¶¶ 25-27 (44 TTABVUE 4). To divine whether Applicant had a bona fide intent to use the mark THE HOTEL EL ROBLAR for hotel services in connection with that property at the time she filed the application, we must consider the totality of the circumstances, including what she did between January 21, 2019 and June 9, 2020, and what she did thereafter.

Applicant had a very full plate between January 21, 2019 and June 9, 2020. In addition to raising her son and "travel[ing] a lot for business," Roe Decl. ¶¶ 8, 51; Ex. A-1 (43 TTABVUE 305, 310, 4), Applicant and her husband were then operating their

---

[54] As discussed above, Butler Consultants never prepared a finished business plan for Applicant, and she never obtained financing for a hotel from the loan broker or any other source. Roe Tr. 196:19-24; 243:5-7 (27 TTABVUE 54, 101).

retail business in Ojai and their Airbnb property in Silver Lake in Los Angeles, and she may also have been working as a realtor. Roe Decl. ¶¶ 3, 6, 10 (43 TTABVUE 304-05). Applicant's trial testimony says very little about what she did between the two dates, and neither Applicant nor her husband specified what, if anything, they did with respect to using the mark THE HOTEL EL ROBLAR in connection with the property at 1725 Maricopa Highway, or any other property, between the dates.

Applicant testified at trial that in 2019

> we were invited to return to The Firehouse, the location was a perfect comparison to 1725 Maricopa Hwy, Ojai, as both properties host 8 rooms. Mr. Landcaster [sic] invited us to stay, he toured us around The Firehouse and shared his development process; from signing a lease, generating investors, structure of investment, design, and operations. My husband and I, have an existing relationship with Mr. Landcaster [sic] in business, having assisted him with the design of his first bar/restaurant Bar Covelle, in 2012. Exhibit A-10 to my Declaration is a true and accurate copy of my stay at The Firehouse on October 14, 2019.[55]

Roe Decl. ¶ 19; Ex. A-10 (43 TTABVUE 306, 38-40).

She also testified that at some unspecified time, the

> 2464 Ojai Ave retirement home became available on the market for purchase. My husband and I toured this additional property as potential hotel conversion, in addition to 1725 Maricopa Hwy, Ojai. We invited to [sic] new potential investors Anna Getty and Scott Oster to tour this location. Ultimately, this property did not prove suitable for the use.[56]

---

[55] In his trial testimony, Applicant's husband never mentioned Mr. Lancaster or any visit to The Firehouse.

[56] Applicant's husband also did not testify about any tour of the retirement home.

Roe Decl. ¶¶ 20-21; Ex. A-12 (43 TTABVUE 306-07, 43-123); Roe Cross Tr. 32:11-35:25; Exs. 7-8 (64 TTABVUE 35-38, 143-222). The referenced Exhibit A-12, a letter from the County of Ventura to the owner of the retirement home, was dated February 21, 2020. Roe Dec. Ex. A-12 (43 TTABVUE 44).

This testimony does not establish that Applicant took any steps between January 21, 2019 and June 9, 2020 directed toward operating a hotel at the property at 1725 Maricopa Highway, or that she was even thinking about that location at all. Applicant testified in her September 26, 2022 discovery deposition that her written communications with Steve Edelson, the owner of the property at 1725 Maricopa Highway, were only via text and were "very recent," Roe Tr. 31:21-33:5 (26 TTABVUE 36-38), but although the record is chock full of texts between Applicant and Mr. Goode regarding the property at 122 East Ojai Avenue, Applicant pointed to no texts with Mr. Edelson regarding the property at 1725 Maricopa Highway. Mr. Edelson testified credibly and without contradiction that there was no relationship of any kind with Applicant, Edelson Decl. ¶¶ 3-4, 6-8 (63 TTABVUE 2-3), and that he had not seen her since sometime prior to September 10, 2019. Edelson Decl. ¶ 10 (63 TTABVUE 3).

The record also shows that Applicant purchased the domain name hotelelroblar.com on December 3, 2019 and obtained a title report regarding the property at 122 East Ojai Avenue sometime in December 2019, but it does not contain evidence of any other relevant activities by Applicant prior to her email exchanges with Mr. Shamshiri in May 2020, to which we now turn.

As discussed above, the parties have very different takes on those emails, particularly Applicant's May 12, 2020 email to Mr. Shamshiri in which Applicant listed all of her domain names and social media handles and stated that "we have no use for them moving forward. . . ." Roe Tr. 91:1-92:6; Ex. 8 (26 TTABVUE 96-97; 28 TTABVUE 39-40). Applying Occam's Razor, the philosophical maxim that "advises [that] the simpler path is usually the best," *Acorda Therapeutics, Inc. v. Mylan Pharms. Inc.*, 817 F.3d 755, 765 (Fed. Cir. 2016) (O'Malley, J., concurring), we find that Applicant's May 12, 2020 email is powerful evidence that she did not have a bona fide intent to use the mark THE HOTEL EL ROBLAR in commerce in connection with hotel services when she filed the opposed application less than a month later.

Neither party discusses the background to Applicant's May 12, 2020 email, but we find that it is significant. As discussed above, Mr. Shamshiri's previous email to Applicant offered to buy a single domain name, thehotelelroblar.com, but Applicant responded by offering to sell **all** of her domain names, as well as "the entire Social Media platform that we had the foresight to secure, covering a multitude of channels," Roe Tr. Ex. 8 (28 TTABVUE 39-40), which Mr. Shamshiri had not requested.

Applicant's explanations in her brief of her statement that "we have no use for them moving forward" are convoluted or contrived (or both). Applicant argues that her May 12, 2020 email "was sent as part of a settlement negotiation with the Opposer," 70 TTABVUE 15, but there is no reference to any dispute in the body of the email, in which Applicant congratulates her friend Mr. Shamshiri on his purchase of The Oaks and wishes his family well during the "very strange times" of the Covid-19

pandemic, Roe Tr. Ex. 8 (28 TTABVUE 39-40), or in Applicant's testimony about the email in her discovery deposition, Roe Tr. 91:1-99:3; Exs. 8-9 (26 TTABVUE 96-103; 28 TTABVUE 39-41), and at trial. Roe Decl. ¶ 64 (43 TTABVUE 311-12).

Evidence pertaining to settlement negotiations is generally inadmissible under Rule 408 of the Federal Rules of Evidence, *see, e.g., Lebanon Seaboard Corp. v. R&R Turf Supply Inc.*, Opp. No. 91197241, 2012 WL 953406, at *3 (TTAB 2012), but Applicant made no effort to exclude the email chain from the record on that basis. As discussed above, Applicant's May 12, 2020 email ultimately precipitated a dispute between the parties, but it did not try to resolve one.

Equally unpersuasive are Applicant's attempts to rewrite her May 12, 2020 email through her after-the-fact testimony about what her words actually meant. Applicant testified in her discovery deposition that her statement that "we have no use for them moving forward" was "in relationship to The Oaks," Roe Tr. 96:2-7 (26 TTABVUE 101), and she repeated this claim at trial. Roe Decl. ¶ 64 (43 TTABVUE 311-12). She also claimed at trial that her reference in the email to "alternate solutions" "refers to Joint Ventures. Including but not limited to; my retaining ownership of the mark and media package, proposing a joint venture which would combine two locations: [sic] 212 [sic] Ojai Ave and 1725 Maricopa Hwy, as an East and West location." Roe Decl. ¶ 66 (43 TTABVUE 312). In her brief, she argues that her "focus was on social media, not the trademark or hotel services moving forward." 70 TTABVUE 15.

Applicant's testimony that her statement was "in relationship to The Oaks" is not credible. Applicant testified in her discovery deposition that it was her intent to use

the domain names "if we acquired the hotel" at 122 East Ojai Avenue, Roe Tr. 119:1-11 (26 TTABVUE 124), but she did not acquire it. It is simply impossible to reconcile Applicant's unsolicited offer to sell all of the listed domain names and social media handles to Opposer with her belated claim that she nevertheless had "use for them moving forward" for a hotel at a location other than 122 East Ojai Avenue.

Applicant's testimony that the "alternate solutions" mentioned in her May 12, 2020 email involved possible joint ventures, including one involving the property at 1725 Maricopa Highway, is belied by the fact that Mr. Shamshiri specifically asked Applicant in his May 15, 2020 email to "[l]et me know what kind of alternate solutions you would consider," Roe Tr. Ex. 8 (28 TTABVUE 39-40), but Applicant did not do so in her May 18, 2020 response. Roe Tr. 97:1-98:16; Ex. 9 (26 TTABVUE 102-03; 28 TTABVUE 41). In the absence of such a response, the simplest explanation for what Applicant meant by her statement that she was "open to alternate solutions" is that the phrase "alternate solutions" was a euphemism for what Mr. Shamshiri described as "how much are you going to charge us in layman's terms." Shamshiri Tr. 45:24-46:6 (48 TTABVUE 48-49). The subsequent emails between Applicant and Mr. Shamshiri confirm this, as they discuss the value of her portfolio of domain names and social media handles, not any possible business relationship between the parties.

Applicant's argument that her "focus was on social media, not the trademark or hotel services moving forward," 70 TTABVUE 15, is contrived. As discussed above, Applicant stated that she first formed the intent to use the mark THE HOTEL EL ROBLAR on August 16, 2018, the day on which she purchased the domain names.

Roe Tr. 185:16-186:3 (27 TTABVUE 43-44). She described the domain names and social media handles collectively as "different marketing terms regarding that particular name," Roe Tr. 68:22-23 (26 TTABVUE 73), and her suggestion in her brief that she would sell to Opposer all of those "different marketing terms regarding that particular name," but that she nevertheless intended to use "that particular name," is not credible. We also find it telling that Applicant failed to respond to Mr. Shamshiri's question about whether Applicant had "any intention to use the domains for something else if we do not acquire the rights?" Roe Tr. 94:17-25; Ex. 8 (26 TTABVUE 99; 28 TTABVUE 39-40).

Finally, Applicant's brief dismisses her May 12, 2020 email as "a minor state of thought from Applicant after receiving disheartening information that Mr. Goode was not actually planning to partner with Applicant and that the Cluff family elected to sell the Location to Opposer." 70 TTABVUE 8. This characterization is also contrived because Applicant received the "disheartening information" more than a year before she sent her email offering to sell all her domain names and social media handles to Opposer.

The simplest explanation of Applicant's offer to sell all of her domain names and social media handles to Opposer on May 12, 2020 because she had "no use for them moving forward" is that she no longer intended to use any EL ROBLAR-formative mark in connection with any hotel, but instead hoped to recoup her investment in the now-useless domain names and social media handles by selling them to Opposer, whom she knew had acquired the property at 122 East Ojai Avenue and surely would

have use for at least some of them in connection with the El Roblar Hotel that Opposer was developing at that location.

The circumstances immediately prior to the filing of the opposed application confirm Applicant's lack of a bona fide intent to use the mark. We have considerable skepticism about Applicant's story that she got the idea to seek registration of her claimed marks based on a conversation with her father-in-law on Mother's Day, but even if the events actually happened, Applicant testified at trial that she "began the Trademark application process" on May 10, 2020, Roe Decl. ¶ 16; Ex. A-8 (43 TTABVUE 306, 36-37), but she did not promptly file an application. Instead, only two days later, she offered to sell Opposer all of her domain names and social media handles, which contained both of the marks that she applied to register about a month later.

In the interim between Applicant's May 12, 2020 offer and the filing of the opposed application on June 9, 2020, Opposer asserted cybersquatting and infringement claims against Applicant, and Applicant engaged counsel to defend those claims. Applicant filed the opposed application and her companion application Serial No. 88956261 one day before her counsel responded to Opposer's demand letter and stated that Applicant had an intent to use the mark, but that "[i]f your client is interested in purchasing those web domains and social media handles from Ms. Roe, then she is happy to consider any reasonable offer, which she can weigh against her intent to use them herself." Roe Tr. Ex. 12 (28 TTABVUE 46).

Again wielding Occam's Razor, we find that the simplest explanation for the timing and sequence of these events is that after retaining counsel to defend against Opposer's claims, Applicant filed her two applications to register the marks THE HOTEL EL ROBLAR and THE EL ROBLAR HOTEL "merely to reserve a right in the mark[s], and not [with] a bona fide intent to use the mark[s] in commerce," *M.Z. Berger*, 787 F.3d at 1378, in order to buttress her counsel's argument in his letter to Opposer's counsel the next day that she intended to use the marks and to obtain leverage in any ensuing negotiations to resolve Opposer's claims or to sell the domain names and social media handles to Opposer.

"We find that Opposer has met its initial burden of a prima facie showing that, as of the filing date of Applicant's application, Applicant did not have a bona fide intent to use the . . . mark [THE HOTEL EL ROBLAR] in commerce . . . ." *Tequila Cuadra*, 2025 WL 1431504, at *7. "Because Opposer has made a prima facie showing that Applicant lacked a bona fide intent to use [her] mark in United States commerce, the burden shifts to Applicant to produce evidence that establishes that [she] had the requisite bona fide intent to use the mark when [she] filed [her] application." *Id.* at *8.

We have found above that prior to the filing of the opposed application, Applicant took no steps directed toward using the mark THE HOTEL EL ROBLAR in connection with the property at 1725 Maricopa Highway, but she may also rely on some post-filing activities and documents to support her claim that she had a bona

fide intent at the time of filing to use the mark at that or another property. *Société Des Produits Nestle*, 2020 WL 4530518, at *16; *Swiss Grill*, 2015 WL 5675642, at *9.

Applicant has nothing of significance to offer in that regard. Applicant admits in her brief that she "has not offered her hotel services under the actual name, THE HOTEL EL ROBLAR since filing of the application," 70 TTABVUE 16, and she also has not advertised or promoted any future hotel services under the mark. Unlike Opposer, who created a website and advised the public that Opposer's Hotel El Roblar was "opening our doors soon," McBride Decl. ¶ 19; Ex. 2 (31 TTABVUE 4, 12-17), Applicant admitted in her discovery deposition in September 2022 that there was no content on her Instagram, Facebook (now Meta), and Twitter (now X) accounts, Roe Tr. 94:3-5 (26 TTABVUE 99), and she did not recall whether she had ever published any content using her domain names. Roe Tr. 94:6-16 (26 TTABVUE 99). Applicant did not testify at trial about any display of the mark at any time on websites or social media accounts, or in her Airbnb listing.

As noted above, Applicant testified on cross-examination that she believed that she was providing hotel services when she rented out her property through Airbnb, Roe Cross Tr. 50:7-22; 70:8-14 (64 TTABVUE 53, 73), but she admitted in her discovery deposition that she has never offered hotel services under the mark THE HOTEL EL ROBLAR through Airbnb. Roe Tr. 126:8-17 (26 TTABVUE 131). She claimed at trial in September 2023 that "Covid 19 has interrupted and delayed every aspect of project development; access to properties for inspections, changing rules and guidelines, limited availability of trades people and staff" and that the "pandemic

continues to offer significant challenges for supply chains globally." Roe Decl. ¶¶ 31-32 (43 TTABVUE 308). Customer reviews in her Airbnb listing show, however, that she rented out her property in Los Angeles during the pandemic in at least April 2020, July, September, and October 2021, and January and March 2022, Roe Decl. Ex. A-1 (43 TTABVUE 5-6), but Applicant never used or displayed the mark THE HOTEL EL ROBLAR in connection with advertising or rendering those alleged hotel services.

Applicant testified at trial that "we have begun the design phase of room upgrades and have plans for changes" for the property at 1725 Maricopa Highway, Roe Decl. ¶ 33 (43 TTABVUE 308), and she authenticated what she described as "true and accurate copies of pictures of the hotel rooms." Roe Decl. ¶ 35; Ex. A-20 (43 TTABVUE 308, 158-212). As discussed above, Applicant and her husband both testified at trial that as of September 2023, Applicant had a lease agreement with respect to the property, Roe Decl. ¶ 25 (43 TTABVUE 307); C. Roe Decl. ¶ 25 (44 TTABVUE 4), but we credit the uncontroverted contrary testimony of Applicant's putative "landlord," Mr. Edelson, that there was and is no such lease or any other commercial relationship with Applicant. Edelson Decl. ¶¶ 3-4, 6-8 (63 TTABVUE 2-3).[57] Under the

---

[57] Even if there had been a lease in September 2023, however, its existence would have been far too attenuated in time from the filing of the opposed application on June 9, 2020 to be probative of Applicant's intent on that date. *See Bos. Red Sox Baseball Club*, 2008 WL 4149008, at *6 ("Applicant's Internet searches and investigations were not conducted until over two years after the filing of his application and, moreover, after the notice of opposition was amended to assert a claim that applicant lacked a bona fide intent to use the mark. Thus, they were not even remotely contemporaneous with the filing of the application.").

circumstances, any post-filing activity by Applicant regarding redesign of or changes to the rooms at 1725 Maricopa Highway is irrelevant.

We find that Applicant did not rebut Opposer's prima facie showing that Applicant did not have a bona fide intent to use the mark THE HOTEL EL ROBLAR in commerce for hotel services when she filed the opposed application on June 9, 2020.

There is no question that Applicant intended to use the mark THE HOTEL EL ROBLAR in connection with a hotel on the property at 122 East Ojai Avenue, but she no longer had a bona fide intent to use the mark for hotel services after the January 21, 2019 rejection of her bid to buy the property, as she effectively admitted in her May 12, 2020 email. On the basis of the "objective evidence of intent" and "the totality of the circumstances," *Tiger Lily Ventures*, 35 F.4th at 1365, we find that Opposer proved, by a preponderance of the evidence, that Applicant did not have a bona fide intention to use the mark THE HOTEL EL ROBLAR for hotel services in connection with the property at 1725 Maricopa Highway, or at any other location, as of the June 9, 2020 application filing date, and that Applicant filed the application "merely to reserve a right in the mark, and not [with] a bona fide intent to use the mark in commerce." *M.Z. Berger*, 787 F.3d at 1378.

**Decision**: The opposition is sustained based on Opposer's claim for relief that Applicant did not have a bona fide intention to use the mark in commerce when she filed the opposed application.[58]

---

[58] "Because we have found for Opposer on its claim of lack of bona fide intent to use, we need not reach the merits" of Opposer's Section 2(a) claim. *Tequila Cuadra*, 2025 WL 1431504, at *11.